## A NATIONAL SOLDIERS' HOME CAN NOT BE SUED FOR A TORT.

OVERHOLSER V. THE NATIONAL HOME FOR DISABLED VOLUNTEER
SOLDIERS.

Decided, April 28, 1903—68 Ohio State, p. 236.

*National Home for Disabled Soldiers—A corporation Created by Con-
gress—Part of Federal Government—Can Not Be Sued for Tort—
Nature of Grant of Power to Sue and Be Sued—Legal Rights.*

1. The National Home for Disabled Volunteer Soldiers is a corpora-
tion created by Congress for the purpose of performing an appro-
priate and constitutional function of the federal government, and
for national purposes only; and as such it is a part of the govern-
ment of the United States, and can not be sued in an action sound-
ing in tort.
2. The grant of power to sue and be sued at law and in equity applies
to such matters only as are within the scope of the other corporate
powers of the defendant, and it does not authorize such corpora-
tion to be sued for a tort.

Error to the Circuit Court of Montgomery County.

This action was begun by a petition in the Court of Common
Pleas of Montgomery County, of which the following is a copy:

"The plaintiff, Neil Overholser, says that the defendant, The
National Home for Disabled Volunteer Soldiers, is a corporation
duly incorporated and organized under the laws of the United
States under Section 4825 and the following sections of chapter
3, Title 59, of the Revised Statutes of the United States.

"Said corporation owns and controls, under said laws, a large
body of land, located in Jefferson township, Montgomery county,
Ohio, covered with barracks, dwellings, hospitals, gas and other
manufactories, with all the necessary and convenient accommoda-
tions for the support of over 5,000 persons in what is known as
'The Central Branch of the National Soldiers' Home,' and has
possession of about 700 acres of land, the management and control
of over 5,000 inmates, and all the machinery, manufacturing, and
general apparatus of said institution, including sewerage.

"The plaintiff says that upon said land the defendant has con-
structed, for the use of said home, a number of tanks in which it

is accustomed to keep in storage a large quantity of crude oil for use for lighting, heating, and manufacturing purposes; that it has also constructed upon said grounds a number of artificial lakes or reservoirs in which it has collected large bodies of water, not naturally subject to be collected upon said grounds; that among other things, said home owns and controls and manages a large hospital in which there are continually under treatment a large number of the inmates of said institution, from which a large quantity of sewerage results, which is carried away and disposed of by said defendant.

"The plaintiff says that he is the lessee of a tract of land comprising about twelve acres located partly in Dayton, Ohio, and partly in Harrison township, Montgomery county, Ohio, at the corporation line of said city, and between it and the said Central Branch of the National Soldiers' Home; that a creek or branch, sometimes known as 'Dry Hollow,' leads down from the land of said defendant which is located upon an elevation above that so leased by plaintiff, to and across the land so leased.

"On the fourth day of June, 1896, the lands so leased by the plaintiff were all in a high state of cultivation, he having planted the same in garden truck of various kinds, and devoted a great deal of care and attention to the same, so that all of the crops growing thereon were in good, sound, healthy condition, many of same being almost ready for market.

"On that day, through the negligence of the employes of the defendant, and without any fault or contributory negligence on the part of the plaintiff, a large quantity of water which had been artificially collected by the defendant in one or more of the lakes aforesaid, was, without right so to do on the part of the defendant, discharged into the said 'Dry Hollow,' and precipitated in a flood upon the lands so leased by the plaintiff. At the same time through the negligence of the defendant, without any right on its part so to do, without any fault or neglect on the part of the plaintiff, · a large quantity of oil was discharged from the cisterns and reservoirs in which the defendant had collected the same, and in addition thereto, a large quantity of sewerage, consisting of vile, noxious and foul-smelling substances, arising from said hospital and the use of same by defendant, were carried down and collected by it in artificial sewers, and all of said substances were discharged by the defendant into the said 'Dry Hollow,' and together with and by means of said volume of water, were carried down and lodged and discharged upon the lands so leased by the plaintiff, as aforesaid. As a result, more than six acres of his lands were wholly submerged, and after the subsidence of the water, the foul substances aforesaid were left and deposited thereon in such a way

and to such an extent that a large part of his crops, consisting of potatoes, red beets, turnips, cucumbers, beans, and peas, etc., were utterly and wholly destroyed, and the remainder were so soaked and permeated with the foul substances aforesaid as to be rendered utterly unfit for market, or for use in any way.

"The plaintiff says that the defendant, having undertaken to collect the water, oil, and other substances on said ground, was bound to so restrain and control the same as not to permit their escape to the damage of the plaintiff. The plaintiff says that he has been damaged, by reason of the premises, in the sum of three hundred dollars, for which, with interest, he asks judgment."

Defendant answered as follows:

"Said defendant admits its incorporation, that it owns and controls the real estate (over 500 acres) described in plaintiff's petition, and the averments as to the number of inmates cared for by defendant. The tanks and artificial bodies of water are located on the real estate, as described in plaintiff's petition; admits the ownership of the real estate in plaintiff as set out in plaintiff's petition; denies each and every other allegation in said petition contained. Wherefore, prays to be dismissed for its costs herein."

The trial in the court of common pleas resulted in a verdict for the plaintiff. A motion for a new trial was made and overruled and a bill of exceptions taken and judgment on the verdict for plaintiff. On petition in error in the circuit court the judgment of the court of common pleas was reversed, as follows:

"This day came on the above cause for hearing upon the petition in error, and was argued by counsel. Upon consideration of the same, the court finds there was error in the charge of the court as to the degree of care required of the plaintiff in error; also in refusing to charge, as requested by the plaintiff in error, in special charge number ten.

"The court further being of the opinion that, upon the pleadings and the facts in the case, there was no liability upon the part of the plaintiff in error, it being the part of the government of the United States.

"It is ordered that the judgment rendered be reversed, and that the petition of the plaintiff in error be dismissed at the cost of defendant in error, and that this cause be remanded to the court of common pleas for execution.

"To all of which findings, and to which judgment and order, the above named defendant in error, Neil Overholser, by his attorneys, excepts."

To reverse this judgment of the circuit court a petition in error is filed in this court. Among the assignments of error is the following: "Said circuit court erred in finding that the defendant in error is part of the government of the United States, and that for this reason there was no liability upon its part to the plaintiff in error."

*Young & Young,* for plaintiff in error.

The home is a corporation, and the statute under which it is organized expressly provides that it shall have power to sue and be sued in courts of law and equity. Soon after its organization, the Supreme Court of Ohio decided that its inmates were exclusively within the jurisdiction of the government of the United States. *Sinks* v. *Reese,* 19 Ohio St., 306.

But, shortly after the decision of this case, by an act of Congress, passed January 21, 1871, jurisdiction over the home was relinquished by the United States and ceded to the state of Ohio, the effect of this recession coming under consideration in the Supreme Court in *Renner* v. *Bennett,* 21 Ohio St., 421.

Even before the recession of the jurisdiction to the state, the Supreme Court of Wisconsin, differently from the Supreme Court of Ohio, held that the home was always subject to the jurisdiction of the state courts. *In re O'Connor,* 37 Wis., 379; 19 Am. Rep., 765.

The home is not a *quasi* corporation, like boards of county commissioners, township trustees, etc., but it is a *corporation* which, under the law creating it, is expressly given the power to sue and be sued.

The acts complained of in the petition were a trespass upon plaintiff's property and distinguished from mere negligence in the performance of a ministerial act.

The circuit court suggests that the remedy of the plaintiff below would be a suit against the officers of the home personally. This may be a very poor remedy. Some of them may be financially responsible, while others may not be.

In the case of a corporation like the home, with capabilities for injuring the persons and property of others by the commission of tortious acts many fold greater than that of other corporations

in the state, it would seem to be establishing an exceedingly dangerous doctrine to say, as the circuit court has done in this case, that the home can not be held liable in the courts for injuries thus inflicted.

In support of our contention that the petition does state a cause of action for which the home is liable to be sued, and that it should not have been dismissed, we cite the court to the following authorities: *Anthony* v. *Adams,* 1 Metc., 284; *Lawrence* v. *Fairhaven,* 5 Gray, 110; *Perry* v. *Worcester,* 6 Gray, 544; *Parker* v. *Lowell,* 11 Gray, 353; *Wheeler* v. *Worcester,* 10 All., 591; *Prop. of Canal Locks* v. *Lowell,* 7 Gray, 223; *Hildreth* v. *Lowell,* 11 Gray, 345; *Haskell* v. *New Bedford,* 108 Mass., 208; *Hill* v. *Boston,* 122 Mass., 344; *United States* v. *Lee,* 106 U. S., 196; *Hannon* v. *St. Louis Co.,* 62 Mo., 313.

A corporation, although much of its work was of a charitable nature, whose purposes were also social, including the giving of lectures and of theatricals and other entertainments for the benefit of its members, the provision of a gymnasium and of athletic sports for promoting the health, and the sale of food at a coffee or lunch counter, was held not within the exemption protecting public charitable corporations from liability for the negligence of servants. *Chapin* v. *Christian Assn.,* 165 Mass., 280; *Glavin* v. *Hospital,* 12 R. I., 411; 34 Am. Rep., 675; *Donoldson* v. *Public Hospital,* 30 N. B., 279; *Levingston* v. *Lurgan Union,* 2 Ir. R. C. L., 202; *Mersey Docks, etc.,* v. *Gibbs,* L. R., 1 H. L., 93; *Mersey Docks, & H. B. (Tr.)* v. *Gibbs,* 11 H. L. Cas., 686.

*McMahon & McMahon,* for defendant in error.

Our objection to the liability of the National Home is two-fold:

1. Institutions of this character are generally held to be exempt from liability for acts of mere negligence upon the part of employes or subordinate officers.

2. The institution is practically the United States government, doing its work through a mere governmental corporation, which work could be as easily done through the war department, or any similar branch of the government, and the government can not be sued in tort.

I. The National Home is a mere branch of the government, to which is confided the care of its disabled soldiers. Section 4825, *et seq.*

Revised Statutes, 1878. On March 3, 1875, Section 4831 was repealed. Revised Statutes Supplement, Vol. 1, p. 71.

In the year 1885, the method of appropriations for the support of the various homes was changed. Formerly the appropriations were in bulk for each institution. By the new law, Congress requires the managers to submit detailed estimates to the Secretary of War, who submits the same in detail to Congress, and by Congress they are considered and allowed. This is the source of the revenue of the homes, and money is specially appropriated for specific purposes. Revised Statutes Supplement, Vol. 1, pp. 486, 513, 627, 928.; Revised Statutes Supplement, Vol. 2, pp. 256, 257.

The home has no power of taxation, or assessment, no local government, no ownership of the ground or other property except in trust for special purposes, no stock, no means of acquiring land or property except appropriations and donations; and it is under the rules and articles of war. The character of the institution is well-defined in two cases in the Supreme Court of Ohio, wherein its nature was directly involved. *Sinks* v. *Reese,* 19 Ohio St., 306; *Renner* v. *Bennett,* 21 Ohio St., 431.

This corporation was established for the convenience of the government of the United States. All its duties could be performed without its intervention. The war department could take it in charge, and through retired officers could discharge the duties and obligations with perfect satisfaction. Indeed, the proposition to make the change has been often advocated by high officials.

To sue the home is to sue the government of the United States. Any judgment rendered could be satisfied only by a levy upon United States property. The distinction in cases of contract and tort is well stated in a recent case in the Supreme Court of the United States. *Belknap* v. *Schild,* 161 U. S., 10.

The remedy is against the officer, who must respond in proper cases, out of his private means. To sue the home is to endeavor to make the government pay. *Conwell* v. *Voorhees,* 13 Ohio, 524.

The District of Columbia has been held liable as a "municipal corporation," *but only as such,* in several cases in the Supreme

Court of the United States. *Barnes* v. *District of Columbia,* 91 U. S., 540; *Railway Co.* v. *District of Columbia,* 132 U. S., 1; *District of Columbia* v. *Woodbury,* 136 U. S., 450.

There is little conflict of opinion as to such cases.

II. We proceed now to the second point made by us; namely, that aside from its being a part of the government of the United States, the nature of the institution is such that it it is not liable under the law of Ohio, as established in our numerous decisions. This ground is practically a reassertion of the reasons given under the first head.

A marked distinction has been recognized between municipalities and other *quasi* corporations in liability for torts or mere acts of negligence of officers or employes. And a distinction is drawn even in the case of cities. Thus, in Ohio, cities have been held exempt from liability for neglect to quell a mob destroying property; for damages for failure to extinguish a fire by reason of a defective department or apparatus; for damages for defective plan of sewerage; for injuries resulting from permitting cannon to be fired in the streets; and for death resulting from the careless handling of defective fire apparatus in the public streets. *College* v. *Cleveland,* 12 Ohio St., 375; *Wheeler* v. *Cincinnati,* 19 Ohio St., 19; *Springfield* v. *Spence,* 39 Ohio St., 668; *Robinson* v. *Greenville,* 42 Ohio St., 629; *Frederick* v. *Columbus,* 58 Ohio St., 538.

The duties performed in the cases above referred to were found to be governmental, and not merely administrative for the sole benefit of the citizens combining into a city. But other classes of corporations—with full power to sue and liability to be sued—have also been held exempt in Ohio, as the following references will show. *Commissioners* v. *Mighels,* 7 Ohio St., 119; *Grimwood* v. *Commissioners,* 23 Ohio St., 600; *Finch* v. *Board of Education,* 30 Ohio St., 37.

In these cases, county commissioners were held free from croporate liability for defective court house, and the flooding of adjoining lands; and a board of education—a full corporation—was dismissed without damages for injuries received from defects in a schoolhouse.

The distinction is well illustrated by a more recent decision in Ohio, the language of which is practically decisive of the case,

assuming Judge Williams' clean-cut statement of the law to be correct. *Dunn* v. *Agricultural Society*, 46 Ohio St., 93.

We assume that the law of the state of Ohio, as found in its decisions, will apply in so far as the liability of such institutions is concerned upon the principles of general law. Of course, if a federal question were involved, as would be the case if the immunity is claimed under the laws of the United States, final adjudication might be had in the Supreme Court of the United States, if the decision was adverse to the home.

The decisions in other states are in harmony with the rule in Ohio. *Williamson* v. *Reform School*, 95 Ky., 251; *Perry* v. *House of Refuge*, 63 Md., 20; *Benton* v. *Hospital*, 140 Mass., 13; *Hill* v. *Boston*, 122 Mass., 344; *Hearns* v. *Hospital*, 66 Conn., 98.

DAVIS, J.; BURKET, C. J., SHAUCK, PRICE and CREW, JJ., concur.

The controlling question in this case is whether the defendant can be sued for a tort. It is a well-established principle in our jurisprudence that no suit can be maintained against the United States, or against its property, in any court, without express authority of Congress. In some of the cases it has been held that for the purposes of jurisdiction there is no distinction between suits against the government directly and suits against its property (*Stanley* v. *Schwalby*, 147 U. S., 508; *Stanley* v. *Schwalby*, 162 U. S., 255, 269-270). The defendant is admitted to be a corporation. Territorially it is within the jurisdiction of the state of Ohio; but by the act of Congress ceding that jurisdiction, it is provided that nothing contained in that act shall be construed to impair the powers and rights *in and over said territory* theretofore conferred upon the board of managers of The National Asylum for Disabled Volunteer Soldiers. These powers and rights were conferred upon the President of the United States, the Secretary of War, the Chief Justice and nine others chosen from time to time by Congress, constituting "a board of managers of an establishment for the care and relief of the disabled volunteers of the United States army, to be known by the name and style of 'The National Home for Disabled Volunteer Soldiers,' and have perpetual succession, with powers to take, hold and convey real and

personal property, establish a common seal, and to sue and be sued in courts of law and equity; and to make by-laws, rules, and regulations, not inconsistent with law, for carrying on the business and government of the home, and to affix penalties thereto." Congress reserved the right to at any time amend, alter or repeal the laws relating to The National Home for Disabled Volunteer Soldiers. This eleemosynary corporation, as it has already been denominated by this court (*Renner* v. *Bennett,* 21 Ohio St., 442), therefore remains in all respects, as it was originally, an institution of the government of the United States for the administration of a charity of the United States. It continues to be, as it always has been, maintained by the funds of the government of the United States. All of the property held in its name was paid for by the United States; and that it is performing an appropriate and constitutional function of the general government nobody doubts; for at this time it is too late to question the power of Congress to create corporations for such purposes (*Osborn* v. *Bank of United States,* 9 Wheat., 738, 859, 872; *McCulloch* v. *Maryland,* 4 Wheat., 316, 411, 422; *Luxton* v. *North River Bridge Co.,* 153 U. S., 529). But, as was remarked by Chief Justice Marshall, in *Osborn* v. *Bank of United States,* 9 Wheat., 860, this corporation is not a private corporation but "a public corporation created for public and national purposes." It is "an instrument which is 'necessary and proper for carrying into effect the powers vested in the government of the United States.' It is not an instrument which the government found ready made, and has supposed to be adapted for its purposes; but one which was created in the form in which it now appears, *for national purposes only."* A suit against a public corporation having no other powers than the performance of a function of the government and accomplishing no other object, is plainly a suit against the government and its property, although nominally it is a suit against the corporation only. This principle was applied by this court in *Finch* v. *Board of Education,* 30 Ohio St., 37, 47, in which it was held that in the absence of a statute creating the liability, a board of education, which was incorporated by an act of the General Assembly, passed March 9, 1849, was not liable in its corporate capacity for damages resulting from its negligence in erecting and maintaining a school

building. It was held that the defendant was "a public agent employed in administering the common school system of the state," and that there is no principle of the common law by which the action could be supported. .

In *Board of Commissioners* v. *Mighels, 7* Ohio St., 109, a case in which the liability for tort of mere governmental agencies, in the absence of express consent of the sovereignty, is denied, Brinkerhoff, J., clearly distinguished municipal corporations and counties as follows:

"Municipal corporations proper are called into existence, either at the direct solicitation or by the free consent of the people who compose them.

"Counties are local subdivisions of a state, created by the sovereign power of the state, of its own sovereign will, without the particular solicitation, consent, or concurrent action of the people who inhabit them. The former organization is asked for, or at least assented to by the people it embraces; the latter is superimposed by a sovereign and paramount authority.

"A municipal corporation proper is created mainly for the interest, advantage and convenience of the locality and its people; a county organization is created almost exclusively with a view to the policy of the state at large, for purposes of political organization and civil administration, in matters of finance, of education, of provision for the poor, of military organization, of the means of travel and transport, and especially for the general administration of justice. With scarcely an exception, all the powers and functions of the county organization have a direct and exclusive reference to the general policy of the state, and are, in fact, but a branch of the general administration of that policy."

This is exactly the distinction which we make here between the defendant in this case and municipal or commercial corporations.

The general doctrine in regard to the liability of the government for torts is thus stated: "Even the state or the general government may be guilty of individual wrongs; for, while each is a sovereignty, it is a corporation also, and as such capable of doing wrongful acts. The difficulty here is with the remedy, not with the right. No sovereignty is subject to suits, except with its own consent. But either this consent is given by general law or some tribunal is established with power to hear all just claims. Or, if neither of these is done, the tort remains; and it is always to be

presumed that the legislative authority will make the proper pro-
vision for redress when its attention is directed to the injury"
(Cooley on Torts, 122-123). The United States has consented
to be sued on its contracts, either in the court of claims or in a
circuit or district court of the United States; but it has not yet
consented to be liable to actions for torts (*Belknap* v. *Schild,* 161
U. S., 17). Therefore, we are not persuaded by the argument
that the power conferred upon this corporation, of suing and being
sued both at law and in equity, must be construed as a consent by
Congress that this particular governmental agency may be sued
upon any cause of action, whether sounding in contract or in tort.
On the contrary we are constrained upon all considerations, to re-
gard this as imposing the power and liability to sue and be sued
in respect to such matters only as are within the scope of the other
corporate powers of the defendant. The National Home for Dis-
abled Soldiers was not given the right to commit wrongs upon
individuals. It was not contemplated that it would do so. It
was created and is perpetuated by the federal government for a
very different purpose. Hence, it can not be inferred that Congress
meant to impose a liability upon this corporation so unusual, so
different from its general policy and so different from the liabili-
ties imposed on other public agencies.

The defendant has no corporate fund nor any property applicable
to the payment of a judgment in such an action as this. A judg-
ment could not be satisfied except by seizing upon the property
and funds supplied by the general government for the purpose for
which the defendant was created, and without which it must cease
to exist. Execution against the defendant would not only bring
on conflict between the state and federal governments, but if al-
lowed, it would tend to the destruction of this splendid national
charity. It is no answer to these considerations to say that a judg-
ment in damages for the tort would be an ascertained basis for an
appeal to Congress for satisfaction; for, as is said by the eminent
author already quoted, it is to be presumed that the sovereign is
always ready and willing to do justice, and a judgment in the
courts, when unauthorized by the government, would not only be
altogether vanity, an empty result, but would be an indecorous
assumption of the right to advise the general government as to its

duty, and of the right to make the judgment the basis of a demand precluding inquiry by the general government as to its ultimate liability. The courts can be better employed than in doing a useless thing.

We, therefore, conclude that the right to sue The National Home for Disabled Volunteer Soldiers for a tort was never contemplated nor conferred. In *Finch* v. *Board of Education, supra,* this court so construed the power "to sue and be sued" contained in the charter of the board of education. Likewise in *Board of Commissioners* v. *Mighels,* 7 Ohio St., 109, 114-117.

The judgment of the circuit court is

*Affirmed.*