### BROOKS HARDWARE CO. *vs.* GREER and Trustee.

### Kennebec.   Opinion May, 1911.

### Held for Rehearing, until August, 1913.

*Army and Navy.   Jurisdiction of State Court.   Soldiers' Home.*
*Trustee Process.*

1.  The principle that the sovereign cannot be sued is predicated upon the condition that it has not consented to be sued, which it may do.
2.  The National Home for Disabled Volunteer Soldiers, established under Act of Congress, March 21, 1866, chapter 21, Sections 1-14, United States Revised Statutes Section 4825, et seq., U. S. Comp. Statute, 1901, page 3337, is not subject to trustee process in an action brought in a state court; the institution not being properly regarded as having its place of business "within the state" within the trustee process statutes, since the State ceded to the United States jurisdiction over the lands on which the Home is situated.

On exceptions by the plaintiff.   Overruled.

This is an action of assumpsit on an account annexed, in which the National Home for Disabled Volunteer Soldiers is summoned as trustee.   The principal defendant was defaulted and it was admitted that the alleged trustee had entered into a written contract with the principal defendant for the complete construction of the improvements of the sewerage and drainage system of the eastern branch of the National Home for Disabled Volunteer Soldiers, located at Chelsea, in the County of Kennebec.   The preliminary question presented to the court was whether the National Home could be legally charged as trustee in this action.   The Justice presiding ruled that it could not be so charged, because it was a disbursing agent of the United States government.   To this ruling, the plaintiff excepted.

The case is stated in the opinion.

*Williamson & Burleigh,* for plaintiff.

*Robert Treat Whitehouse,* U. S. Attorney specially for trustee.

SITTING: EMERY, C. J., SAVAGE, SPEAR, KING, BIRD, JJ.

KING, J.  This is an action of assumpsit, on an account annexed, brought in the Supreme Judicial Court for Kennebec County, Maine, in which the National Home for Disabled Volunteer Soldiers is summoned as trustee.  The principal defendant was defaulted.  It was admitted that the alleged trustee had entered into a written contract with the principal defendant for the complete construction of the improvements of the sewerage and drainage system of the eastern branch of the National Home for Disabled Volunteer Soldiers, located at Chelsea, in said county of Kennebec, and the plaintiff introduced evidence tending to show a balance due the principal defendant in the hands of the treasurer of the Home at the time of the service of the writ upon the alleged trustee.  The case was heard by the presiding Justice upon the preliminary question whether the National Home could be legally charged as trustee in this action, and the Justice ruled that it could not be so charged, because it was a disbursing agent of the United States government.  The case is before this court on plaintiff's exceptions to that ruling.

The question thus presented leads at once to an inquiry as to the creation and constitution of the National Home for Disabled Volunteer Soldiers, and its character and functions.  It was established under the provisions of an act of Congress, approved March 21, 1866, and now embodied in R. S., U. S., sec. 4825 et seq. Section 4825 is as follows:

"The President, Secretary of War, Chief Justice, and such other persons as have been or from time to time may be associated with them, shall constitute a board of managers of an establishment for the care and relief of the disabled volunteers of the United States army, to be known by the name and style of 'The National Home for Disabled Volunteer Soldiers,' and have perpetual succession, with powers to take, hold, and convey real and personal property, establish a common seal, and to sue and be sued in courts of law and equity; and to make by-laws, rules and regulations, not inconsistent with law, for carrying on the business and government of the home, and to affix penalties thereto." U. S. Comp., St. 1901. p. 3337.

In the other sections of the act, and in the subsequent statutory amendments and additions, it is provided, in substance, and so far as seems material here, that nine managers of the Home (the number was subsequently increased) shall be elected from time to time, as vacancies occur, by joint resolution of Congress; that the managers shall have authority to select sites for branch Homes and have the necessary buildings erected; that the general treasurer shall give bond to the United States "faithfully to account for all public moneys and property which he may receive," and the treasurer of the branch Homes shall give bond to the general treasurer; that no money shall be appropriated or drawn for the support and maintenance of said Home, "except by direct and specific annual appropriations by law." In the original act it was provided that the managers should make an annual report of the condition of the Home to Congress on the first Monday of every January, and that they should audit the accounts of the treasurer; but later provisions in this respect, and as to the limit and regulation of expenditures, were more exacting and explicit, and are important as showing the relation of the "establishment" so created by Congress to the general government.

By the Act of March 3, 1887, c. 362, 24 Stat., 539, (U. S. Comp., St. 1901, p. 3348) it was required that "all of the expenditures of the said home, including the expenses of the board of managers, shall be made subject to the general laws governing the disbursements of public moneys, so far as the same can be made applicable thereto, and shall be audited by the proper accounting officers of the treasury, under such rules and regulations as may be prescribed by the Secretary of the Treasury."

By the Act of March 3, 1891, c. 542, 26 Stat., 984, (U. S. Comp., St. 1901, p. 3348), it was provided: "That the accounts relating to the expenditures of said sums, as also all receipts by said Home from whatever source, shall, in addition to the supervision now provided for, be reported to and supervised by the Secretary of War."

By the Act of March 3, 1893, c. 210, 27 Stat., 653, (U. S. Comp., St. 1901, p. 3349), it was provided that: "The Secretary of War shall hereafter exercise the same supervision over all receipts and

disbursements on account of the Volunteer Soldiers' Homes as he is required by law to apply to the accounts of disbursing officers of the army."

And by the Act of March 3, 1901, c. 853, 31 Stat., 1178, (U. S. Comp., St. 1901, p. 3350), it was provided: "That the accounts relating to the expenditures of all public moneys appropriated for the support and maintenance of the National Home for Disabled Volunteer Soldiers shall be audited by the board of managers of said Home in the same manner as is provided for the accounts of the various departments of the United States government, and thereupon immediately transmitted directly to the proper accounting officers of the Treasury Department for final audit and settlement."

The Home can make no contract not authorized by Congress, or under an appropriation adequate to its fulfillment. Expenditures must be applied solely to the objects for which they are appropriated, and are not to exceed such appropriations. With some small exceptions, all the means for the establishment and support of the Home are provided by Congress.

A consideration of the provisions of the act of Congress of March 21, 1866, which created and provided for the perpetual maintenance of the National Home for Disabled Volunteer Soldiers, as a great national charity to be supported by appropriations from the national treasury, together with an examination of the many subsequent acts of Congress which have explicitly defined the purposes, limited the powers, regulated the management, and controlled the expenditures of the Home, leads us to the conclusion that the essential character and functions of this "establishment" are those of an agency—an instrumentality of the United States government.

It was the United States that had the purpose to establish this great public charity, and that was to provide the means for its perpetual maintenance from its treasury. To effectuate that purpose, it created this "establishment" as its agency to execute its will. The money appropriated by Congress from the national treasury for the support of this charity is the money of the United States, and not the money of the Home, and it so remains until expended for the purposes intended. This is clearly apparent from

the explicit congressional provisions and requirements as to its expenditures, and especially that requiring the treasurer of the Home to give bond to the United States "faithfully to account for all *public moneys* and property which he may receive."

But the plaintiff contends that, if the National Home for Disabled Volunteer Soldiers is to be regarded as an agency or instrumentality of the United States, it is, nevertheless, subject to this trustee process, which is in effect a suit against it, because the act which created and established the Home expressly provided that it could "sue and be sued in courts of law and equity."

The application of the well-settled principle that the sovereign cannot be sued is, of course, necessarily predicated upon the condition that the sovereign has not consented to be sued, which it may do.

It has been held that this power conferred upon the Home, to sue and be sued, is not to be construed as a consent that it may be sued in tort. *Overholser* v. *National Home,* 68 Ohio St., 236, 67 N. E., 487, 62 L. R. A., 936, 96 Am. St. Rep., 658. But no case has been called to our attention (except, perhaps, *Foley* v. *Shriver,* 81 Va., 568), and we have found none, in which the question has been considered whether the Home can be sued in the state courts in actions ex contractu. *Foley* v. *Shriver,* supra, was an action in the State Court in which it was sought to charge the Home as trustee—precisely the same question as here presented—and the court there held (1) that the federal government had exclusive jurisdiction of the territory of the Home under the ceding act of the state of Virginia, excepting only that civil and criminal processes of the state courts could be served there, and (2) that the officers of the Home were disbursing officers of the United States government, and that the funds in their hands as such cannot be attached under trustee process. The court did not consider, or at least comment, as to the effect to be given to the provision that the Home could "sue and be sued."

Whether this provision of the act imposing upon the Home the liability to be sued must be construed as a consent by Congress that this governmental agency may be sued in the state courts, and if so, upon what causes of action, is an inquiry not necessary to be

decided, we think, in the determination of the question now before us, for in this case the plaintiff regards the alleged trustee as an independent corporation, and as such seeks to charge it as a trustee of the principal defendant. And assuming, but not admitting, that it is such an independent corporation, the question presented is whether it is within the provisions of the statute of this State authorizing corporations to be summoned as trustees; that statute provides that: "All domestic corporations, and all foreign or alien companies or corporations established by the laws of any other state or country, and having a place of business, or doing business within this state may be summoned as trustee." Rev. St., chap. 88, sec. 8. Our court, then, did not have jurisdiction to summon this National Home as trustee, unless the Home, which is not a domestic corporation, had a place of business, or was doing business, within this State. It is not contended that the Home as a corporation had any place of business, or was doing business at any place, in this State, other than upon the territory of the eastern branch of the Home in Kennebec county. The question then is whether this "establishment," irrespective of whether it is an independent corporation or not, had a place of business "within this state."

The title to the land comprising the Home is not in the United States, but in the "establishment," as it is called in the act of Congress, which was empowered to take and hold title to real estate. That title was acquired by the consent of Maine, expressed in chapter 66 of the Public Laws of 1867. In that act it was provided: "And jurisdiction over said lands is hereby granted and ceded to the United States; provided that this state shall retain a concurrent jurisdiction with the United States in and over said lands; so far that all civil processes, and such criminal processes as may issue under the authority of this state against any person or persons charged with crimes or offenses committed outside of said lands, may be executed thereon, in the same manner as though this cession and consent had not been granted; and provided further, that no change shall be made in the location of highways over said premises without the consent of the county commissioners of Kennebec county." If by this act of cession the territory ceded ceased to be territory over which the State of Maine has jurisdiction, and

became territory over which the United States has exclusive jurisdiction and supremacy, then it follows that the Home has no place of business, and is not doing business, "within this state," for the import of those words as used is "within the jurisdiction of this state." The language used in this ceding act is practically identical with that used in the ceding acts passed by other states, where land has been purchased by the United States for public purposes, from which fact it is reasonable to infer that the use of such uniform language of cession was at the instance of the United States; and an examination of the cases in which this language has been construed discloses the reason for its use to be in the fact that its construction, by both federal and State Courts, has been definite and consistent from an early date.

It is provided in article 1, sec. 8, of the United States Constitution, that: "The Congress shall have power . . . to exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may by cession of particular states, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the Legislature of the state in which the same shall be for the erection of forts, magazines, arsenals, dockyards and other needful buildings." In the decisions construing ceding acts, where land has been purchased by the United States with the consent of the State, and determining the extent of the jurisdiction of the United States over such ceded territory, regard has been had to this constitutional provision.

In *Commonwealth* v. *Clary,* 8 Mass., 72, involving the question of jurisdiction over lands at Springfield, purchased by the United States, with the consent of the State, for erecting thereon arsenals, etc., the court, by the Chief Justice, said: "On the facts argued in this case we are of opinion that the territory on which the offense charged is agreed to have been committed is territory of the United States, over which Congress have the exclusive power of legislation. The assent of the commonwealth to the purchase of this territory by the United States, had this condition annexed to it, that civil and criminal process might be served therein by the officers of the commonwealth. This condition was made with a view to prevent the territory from becoming a sanctuary for debtors and criminals."

In *Mitchell* v. *Tibbetts,* 17 Pick., (Mass.), 298, the same con-struction was put upon the same language in the ceding act of the territory for the Charlestown Navy Yard.

In 1841 the House of Representatives of Massachusetts requested the opinion of the Justices of the Supreme Court of that State whether persons residing on lands in that State, purchased by or ceded to the United States for navy yards, arsenals, dockyards, forts, etc., were entitled to the benefits of the State common schools for their children in the towns where such lands were located, and the Justices answered in the negative saying: "Where the general consent of the commonwealth is given to the purchase of territory by the United States for forts and dockyards, and when there is no other condition or reservation in the act granting such consent but that of concurrent juisdiction of the State for the service of civil process and criminal process against persons charged with crimes committed out of such territory, the government of the United States has sole and exclusive jurisdiction over such terri-tory for all purposes of legislation and jurisprudence, with the single exception expressed." Accordingly it was there held that the persons residing on such territory were not entitled to the benefits of the common schools for their children in the towns in which such lands are situated; that they are not subject to taxation by said towns; that residence upon such territory for any length of time will not give such person a "legal inhabitancy" of such towns; and that such persons were not entitled to any elective franchise in such towns. Opinion of Justices, I Metc., 580.

In *Ft. Leavenworth R. R. Co.* v. *Lowe,* 114 U. S., 525, 5 Sup. Ct., 995, 29 L. Ed., 264, the question of the jurisdiction over lands within a State, acquired by the United States with the consent of the State, is exhaustively considered, and the authorities as to the construction of the uniform language of the ceding acts are collated, showing "the consistency with each other of the decisions on the subject by federal and state tribunals, and of opinions of the Attor-neys General." It is there said: "When the title is acquired by purchase by consent of the Legislature of the state, the federal jurisdiction is exclusive of all state authority. . . . The reser-vation which has usually accompanied the consent of the state,

that civil and criminal process of the state courts may be served in the place purchased, is not considered as interfering in any respect with the supremacy of the United States over them; but is admitted to prevent them from becoming an asylum for fugitives from justice."

The Ft. Leavenworth case was an action to recover back the amount of a tax paid, which the State of Kansas had assessed against the plaintiff upon its railroad property upon the military reservation. The land constituting the reservation was part of the territory acquired in 1803 by cession from France, and for many years prior to the admission of Kansas as a state the territory of the reservation had been reserved from sale. After the admission of Kansas, the Legislature of the State passed an act ceding to the United States jurisdiction of the land of the reservation, containing substantially the same language as in other ceding acts, providing for the right to serve civil and criminal processes in the territory, and also "saving further to said State the right to tax railroad, bridge, and other corporations, their franchises and property on said reservation." The court held that this reservation was valid and that the tax could not be recovered back. As we understand the opinion, it states the reason for the decision of the court, on the precise question involved, to be that the land of the reservation was not purchased by the United States with the consent of Kansas, and that the subsequent cession of jurisdiction to the United States was not exclusive, containing a saving clause of the right to tax the railroad, and that the exercise of the right under that saving clause did not interfere with the use of the reservation by the United States; and hence the right to tax the railroad existed in the State the same as before the cession. But the paramount idea of the opinion, as the conclusion of the court, after a review of the authorities, manifestly is that the effect of a cession of jurisdiction over certain territory within a state to the United States, by consent of the state, reserving to the state only concurrent jurisdiction to serve civil and criminal processes therein, is to put that territory under the exclusive jurisdiction and dominion of the United States, with the single exception expressed, at least when the property is purchased for the constitutionally specified purposes.

The following cases involved the question as to the jurisdiction over lands purchased, with the consent of the states, for sites for branches of this National Home. *Sinks* v. *Reese,* 19 Ohio St., 306, 2 Am. Rep., 397; In re O'Connor, 37 Wis., 379, 19 Am. Rep., 765; *Foley* v. *Shriver,* 81 Va., 568; In re Kelley (C. C.) 71 Fed., 545. It will be seen that these cases are to some extent conflicting.

In *Sinks* v. *Reese,* supra, the Supreme Court of Ohio had before it the question of the legality of votes cast at an election of a county officer by inmates of the branch of the National Home located in that State, and the conclusion there reached is that the legislative cession of jurisdiction to the United States operated to fix "the exclusive jurisdiction of the general government over this institution, its lands, and its inmates, 'in all cases whatsoever,' except as to the execution of process issuing under state authority." Speaking of a person who becomes an inmate of the Home, the court said: "He becomes, subject to the exclusive jurisdiction of another power, as foreign to Ohio as is the State of Indiana or Kentucky, or the District of Columbia."

The court holds that: "Asylums for the disabled soldier in no substantial sense differ from hospitals in a fortress or in the field. All are alike necessary, and the power to erect and maintain them is incidental to the war power of the government;" and hence that the land was acquired for a purpose reasonably within the constitutional purposes.

In *Foley* v. *Shriver,* supra, an action of foreign attachment against the Home, hereinabove referred to to some extent, the court of Virginia seems to regard the constitutional provision giving to the United States power to exercise exclusive jurisdiction over lands within a State, purchased by the United States with the consent of the State, as applicable to the question before it.

The court said: "In this case the state Legislature having given the required consent and the United States having purchased the land in question, the United States have acquired, under the federal Constitution, exclusive jurisdiction over the ceded land, and they are no longer a part of the state of Virginia and are not subject to the jurisdiction of the state courts." It was also held, as hereinbefore stated, that the officers of the Home were disbursing

officers of the United States government, and for that reason not subject to trustee process. It is thus seen that in the Ohio and Virginia cases it is held that the lands acquired for the branch Homes, under the ceding acts of the respective States, are under the exclusive jurisdiction of the United States.

In the two Wisconsin cases, however, the conclusion was reached that the State Courts had at least jurisdiction over criminal offenses committed on the land on which the branch Home in that State was located.

In re O'Connor the question was whether the State Court had jurisdiction to try an inmate of the Home for an alleged assault and battery committed upon another inmate upon the grounds of the Home. The court held in favor of such jurisdiction, treating the ceding act of the State as void, because the land was not purchased directly by the United States, a feature of the decision commented upon somewhat adversely in the latter case of In re Kelley, which arose in the United States Circuit Court of the same State.

In re Kelley, supra, the question was reversed from that in the O'Connor case, and was whether the Circuit Court had jurisdiction to try and punish the petitioner charged with the commission of a crime upon the grounds of the Home, and the court held that it did not have such jurisdiction. In the opinion the learned District Judge reasons and holds that the constitutional provision giving the Congress power to exercise exclusive jurisdiction over lands purchased with the consent of the State in which the same is situated, is only applicable to cases where there is an actual purchase, with the consent of the State, for the constitutional purposes, and when that is the fact all jurisdiction passes to the United States by virtue of the constitutional provision, and irrespective of any express cession of jurisdiction, other than an unqualified consent by the State that the purchase be made. He seems to regard the purposes of the establishment and maintenance of the National Home as not within the letter of the constitutional purposes, but he says: "But, whatever may be the rule pronounced when that question arises, it appears indisputable that all State jurisdiction is not excluded from every parcel of land purchased by the general government in a State with legislative consent, irrespective of its use;

and therefore that, if the purpose is not one of those distinctly named in this clause of the Constitution, the act of Congress which provides for the purchase and requires the legislative consent must in some unequivocal terms declare that exclusive jurisdiction is intended and necessary for the proposed use, or at least the purpose stated must be one of which it is manifest that any exercise of co-ordinate or other jurisdiction would be incompatible therewith." And he further says: "I am therefore of opinion that this clause of the Constitution, upon which the Ohio and Virginia decisions mainly rest their view of the state enactments, respectively, is not applicable to this Wisconsin case, and cannot be invoked to exclude the exercise of state jurisdiction over the crime charged against the petitioner."

Passing to the consideration of the effect of the ceding act, he says: That "has impressed me as presenting the greatest difficulty" but the conclusion is reached "that the purpose was not one for which exclusive legislation was prescribed, either by the Constitution or by congressional enactments; the omission of the word "exclusive" or some equivalent is material, and in my opinion the act must be interpreted, as ceding—that is, yielding or surrendering—to the United States such jurisdiction as Congress may find necessary for the objects of the cession, and for the exercise of which there must be clear enactments to that end within its powers."

This decision In re Kelley is the only expression of the federal courts, so far as we are advised, touching the question of jurisdiction over the sites of the branch Homes, and for that reason we have referred to it at some length. It seems very clear to us that the question involved in that case whether the United States had such exclusive judisdiction over the territory owned by the Home as would take from the State jurisdiction over crimes committed thereon is entirely different from that involved in the Virginia case, and in the case now before us. In the Wisconsin cases the question of jurisdiction was respecting only a person on the territory of the Home, and his acts committed there, but forming no part in the execution of the functions of the Home. But the question here presented is whether the United States has the exclusive jurisdiction over the Home itself—the "establishment" created by Congress for the sole purpose of maintaining and carrying on, under explicit con-

gressional regulations, a great national charity supported by appropriations from the treasury of the United States. We do not understand the federal decision to hold, even by implication, that the United States does not have such exclusive jurisdiction. Such jurisdiction over the Home itself, over the impersonal entity, created by the general government to execute its purposes as expressed in the congressional enactments establishing the Home, and providing for its perpetuation and maintenance, must have been intended, for, in the language of the Kelley case, "it is manifest that any exercise of co-ordinate or other jurisdiction (over the Home itself) would be incompatible therewith." Such exclusive jurisdiction is obviously necessary for the proper execution of the functions of the Home. And we are of opinion that, under the purchase of this territory in Maine, on which the eastern branch of the Home is located, the title to which was taken in the name of the Home, but which was paid for from the national treasury, and under the ceding act passed by the Legislature of Maine, expressly consenting to the purchase, "for the purpose of locating, erecting, and maintaining thereon an asylum for disabled volunteer soldiers" and ceding to the United States "jurisdiction over said lands," excepting only that civil and criminal processes issued from the state courts might be served thereon, the United States has the exclusive jurisdiction over the Home itself as the "establishment" which Congress created, and that the "establishment," though regarded as a corporate existence and having the right to sue and be sued, does not have its place of business "within this state," and is not subject to trustee process issued from the courts of this State.

We do not here undertake to decide the question as to what jurisdiction the state courts may have over crimes committed on the territory of the Home, or over rights arising between individuals residing on the territory, or between them and persons residing elsewhere in the State, or any of the many other questions that might arise involving jurisdiction over the territory. Those questions are not now presented.

For the reason above stated, the entry must be,

*Exceptions overruled.*