56 So.2d 911 (1952)
SUWANNEE COUNTY HOSPITAL CORP.
v.
GOLDEN et al.
Supreme Court of Florida, en Banc.
February 12, 1952.
Keen, O'Kelley & Spitz, Tallahassee, for appellant.
Ferguson & Jopling, Lake City, for appellees.
THOMAS, Justice.
The appellees were successful in their action against the appellant for damages resulting from an injury to Claudia Golden, the wife, when she was severely burned by hot water bottles improperly applied while she was a patient in appellant hospital.
The first question constitutes a challenge of the court's order striking defenses, setting up a part of appellant's charter *912 which we shall presently quote, and averring that the appellant, supported and maintained by ad valorem taxes and receipts from race track funds, together with a "Hospital Tax," constituted the hospital district, and the institution itself, an arm of the county which was immune from such damages as were recovered in the circuit court.
The court's order amounted to an adjudication that the pertinent portion of the act was unconstitutional, and also that the character of the organization was not such as to relieve it of liability under the circumstances of this case.
The two phases of the ruling, that is, the natures of the act and the creature of the act, seem to have been blended in counsels' treatment in the briefs.
By Chapter 23547, Laws of Florida, Special Acts of 1945, a district was created for the purpose of building and maintaining a hospital "* * * for the benefit of the citizens and residents * * *" of Suwannee County, "* * * and the extension, when available, of hospitalization to patients from other and adjoining counties; provided, however, that patients from other counties * * * shall be required to pay the cost of such hospitalization * * *."
The Legislature was at pains to declare in the act that the hospital was to be "public," the corporation "public," and the district "public"; also that the corporation was to be non-profit with net earnings placed in a reserve fund to be used for hospital purposes.
The trustees were empowered to prescribe maximum charges and fees, and to determine who should receive hospitalization free because of inability to pay.
The particular provision brought into focus by this controversy is: "The said corporation may contract and be contracted with, and may sue and be sued, but said corporation shall not be liable for any negligence of any of its officers, agents or employees, including doctors and surgeons and nurses who may be engaged in work at or about said hospital, and shall not be liable for any tort committed by any officer, agent or employee of said corporation." (Italics ours.)
Counsel for appellants have directed us to decisions of a federal court and of the Supreme Courts of Ohio and Alabama, which seem to support the position that an institution like Suwannee County Hospital should not be held responsible for damages from tort.
The federal court was dealing with a suit against a home for disabled volunteer soldiers and held that a charitable organization created, owned, and maintained by the government and engaged in its public duties was "* * * exempt from liability to a private action for negligence in the discharge * * *" of those duties. Lyle et al. v. National Home for Disabled Volunteer Soldiers, C.C., 170 F. 842, 845.
The Supreme Court of Ohio, in Overholser v. National Home for Disabled Volunteer Soldiers, 68 Ohio St. 236, 67 N.E. 487, 489, 62 L.R.A 936, concluded that the corporation was created for "`public and national purposes'" and that a suit against it, inasmuch as it was performing only a function of government and accomplishing no other object, was, in fact, a suit against the government. The court then likened the organization to a board of education which could not be made responsible for damages in erecting and maintaining a school building.
This decision brought to counsels' mind our ruling in Bragg v. Board of Public Instruction of Duval County, 160 Fla. 590, 36 So.2d 222, where we, too, held that a Board of Public Instruction was engaged in a public function, and not subject to actions for tort; and to Cleary v. Dade County, 160 Fla. 892, 37 So.2d 248, where we were treating of the acquisition by the county of a hospital in Miami and where it was remarked that the governmental agency was charged under a statute with the care of the sick, aged, and indigent.
But up to this point, we are unaware of any commitment of this court to the proposition that a hospital operated by the public and accepting patients for compensation  this was the case here  may escape payment *913 for injury to such patients suffered through negligence.
A case apropos appellant's contention appears in Moore v. Walker County, 236 Ala. 688, 185 So. 175, where it was decided that a county which equipped, maintained, and operated a hospital to administer to persons who were indigent or unable to pay could not be sued for negligence, there being no provision for such liability in the act authorizing the operation. It is fair to point out that the hospital was in the main a charitable institution with authority to admit patients able to pay, and that the money received from them was required to be used for operation expenses.
This authority of considerable respectability seems to bear out appellant's position, but we firmly disagree with it and feel we are obligated to exercise our prerogative of interpreting the Florida Constitution according to our own consciences and understanding.
In the first place, we see no fundamental sameness in a hospital and the school system, and very little in a hospital and a home for disabled veterans.
As important as public health is and as indispensable as hospitals are to public health, it seems to us their activities fall more clearly in the category of "proprietary" functions than "governmental" functions, as to those patients who pay for the services they require and who are justified in expecting they will receive free of negligence the expert services for which they pay.
Institutions such as these are not a part of any state-wide system maintained at public expense, so all who become afflicted, may, regardless of their individual worth, have the advantages of professional nursing, medical attention, and modern scientific apparatuses without cost to them.
Actually, construction of hospitals is often financed by a public corporation because of the large amount required for the purpose, and operation likewise is supervised and underwritten to keep them going concerns. Deficits between income and outgo are met by some form of taxation because of the definite value of hospitals to the community.
But what conceivable difference is there between the functioning of a non-profit institution, operated by a district, and the activities and services of doctors, nurses, and technicians connected with it, and a hospital owned and operated privately. We can think of none. Yet, from a commercial standpoint, there is quite a difference, for the public one pays no taxes, on the contrary, can draw upon the exchequer for financial aid, and while the privately owned one pays its own way, and actually helps through taxation to pay the other's way also. A distinction from a humanitarian view is that the public corporation can and should more appropriately care for those unfortunate persons who are unable to pay for their treatment.
It is our view that one who enters a hospital of the type of appellant and pays for the professional services he receives is entitled to the same protection, and under our constitution, to the same redress for wrongs, that he would be entitled to had he had the same experience in a privately owned and operated hospital. And it bothers us not at all that the corporation is called "non-profit," the "net earnings" to be "placed in its reserve fund, and used for hospital purposes." True, these "net earnings" do not reach the pocket of any individual, but we can see no impropriety or illogic in making them available for the sick who have been injured by mis-treatment as well as those who seek a restoration of health by proper treatment.
At least as to those who are paying patients like appellee, the hospital is operated in a proprietary capacity, and they may not be divested of constitutional rights by the attempted statutory immunization. As to persons of that classification, the hospital is the same as if it were privately maintained, its duty to the patient is the same, and it should be equally responsible for its torts.
An enterprise is not governmental in character simply because the government enters it or the Legislature declares it so. Whether it be governmental or proprietary depends on the nature of the business and the determination of the courts. We can only wonder when the entry of *914 government into businesses as well and as readily operatable by individuals will cease. If the government undertakes to enter other fields such as amusement, entertainment, transportation, and communication, as is the present trend, on a basis that makes the competition one-sided because of the taxation feature, should the situation be made more unfair by declaring that inasmuch as the government is involved, no redress should be secured to one injured by negligence in the operation?
The church and the school are eliminated from consideration because the education of children is especially bidden in the constitution, while preference and aid to any church is expressly forbidden.
We are sympathetic with the view of the Supreme Court of Idaho expressed in Henderson v. Twin Falls County, 56 Idaho 124, 50 P.2d 597, 101 A.L.R. 1151, that in administering to pay patients, a public hospital was not engaged in a governmental function, but in a proprietary or private business, there being a duty to care for the indigent, but none to care for those able to pay. Such an enunciation seems not unharmonious with what we said in City of Miami v. Oates, 152 Fla. 21, 10 So.2d 721.
The appellee, Claudia Golden, went into a state of shock following a serious operation. She was unconscious for many hours, and when she regained her senses, she complained of pain in one of her legs. It was then discovered that she had been burned, evidently by hot water bottles applied to her limbs. There was testimony that the application of heat was proper treatment but that the bottles were not equipped with insulative covers. The patient had varicose veins in both legs, making them extremely sensitive to heat, so it could be logically deduced that injury resulted from improper use of a correct remedy.
Affirmed.
SEBRING, C.J., and TERRELL, HOBSON, ROBERTS and MATHEWS, JJ., concur.
CHAPMAN, J., not participating.