**KANSAS CITY POWER & LIGHT CO. v. NATIONAL LABOR RELATIONS BOARD (ASSOCIATION OF EMPLOYEES OF KANSAS CITY POWER & LIGHT CO., Intervenor).**

No. 445.

Circuit Court of Appeals, Eighth Circuit.

July 26, 1943.

Irvin Fane and Ludwick Graves, both of Kansas City, Mo. (Johnson, Lucas, Graves & Fane, of Kansas City, Mo., on the brief), for petitioner Kansas City Power & Light Co., Chester C. Smith and A. E. Bettis.

A. Norman Somers, Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, Roman Beck, and Leslie Clifford, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

Heretofore, this Court entered its decree enforcing (with modifications not here material) an order of the Board against the Company and several of its officers, 111 F.2d 340. The present proceeding is on a petition of the Board for civil contempt for violation of one element of the order. The Company and two of its officers are respondents. Separate answers were filed. Affidavits were filed supporting the petition and the answers. A joint motion was filed to vacate the rule to show cause or, alternatively, to strike the petition and its supporting affidavits. Petitioner filed a motion to strike certain parts of the answer of the Company. A hearing was had upon the motions at which the advisability of determining the fact issues upon the affidavits was considered. Both motions were denied and the Court determined it would be better to have the facts presented by evidence before a master with full opportunity for cross-examination. 8 Cir. 125 F.2d 545. A master was appointed to take and return the evidence with his recommendations.[1] The Master held full hearings and has returned the entire testimony[2] and also a condensed statement thereof. The Master has filed his report which reveals painstaking care and industry in defining the separate fact issues and in assembling the evidence relating to each. The report concludes: "It is concluded, from a consideration of all the facts and circumstances in evidence in this case, that the proof is not sufficient to establish it to be a fact that the Defendants herein or either of them have violated the terms of the Decree of this Court rendered on the 25th day of April, 1940, and it is recommended that the Court so find." The Board has challenged the recommendation of the Master and we have heard the matter upon careful briefs and excellent oral presentation.

The Board presents here only one, but an important, issue: "The Independent

---

[1] The Master was the Honorable Guy B. Park who had been a State Circuit Judge and Governor of Missouri.

[2] The testimony with exhibits, the pretrial proceedings and stipulations fill some 1,600 pages.

is the continuation or successor of the Association."[3] A short historical statement is necessary to understand what this issue is. From September, 1933, to April 12, 1937 (when the validity of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., was upheld in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352), the employees of the Company acted under an organization initiated, promoted and, so far as necessary, financed by the Company and called the "Employees Representation Plan." The plan ceased to function about the last above date. During May and June, 1937, an independent organization of employees was formed, known as "The Association of Employees of Kansas City Power and Light Company." The Board made an order which, inter alia, required the Company to withdraw all recognition of the Association because it found the Association to be dominated by the Company (12 N.L.R.B. 1414). This Court decreed enforcement of that portion of the order, 111 F.2d 340. Thereafter, the employees formed another organization known as the "Independent Union of Utility Employes." The contention here is that the Independent is but "the continuation or successor of the Association" and not an organization formed by the employees acting free from Company influence or domination.

Before examination of the evidence as to this issue, the applicable rule of proof should be stated since the parties seem in disagreement as to that matter. The Board urges that the rule of proof should be the same as it would be if the issue here were before the Board for determination upon complaint filed there.[4] The Company insists that the rule is that pertaining to civil contempt cases which rule is, it states, that the proof of contempt must be "by clear and convincing evidence."

The rule as to quantum of evidence in civil contempt proceedings is in no way affected by the situation. that such proceeding is in connection with an enforcement decree of an order of the Board. National Labor Relations Board v. Tupelo Garment Co., 5 Cir., 122 F.2d 603, 606. The rule is that contempt need not be shown beyond a reasonable doubt but that something more than a bare preponderance of evidence is necessary. Oriel v. Russell, 278 U.S. 358, 364, 49 S.Ct. 173, 73 L.Ed. 419; California Artificial Stone Paving Co. v. Molitor, 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106. This Court has stated that a "degree of certainty" is required which leaves no fair ground of doubt. City of Campbell v. Arkansas-Missouri Power Co., 65 F.2d 425, 428. Other courts of appeals have expressed the rule as requiring clear and convincing proof. National Labor Relations Board v. Tupelo Garment Co., 5 Cir., 122 F.2d 603, 606; Fox v. Capital Co., 3 Cir., 96 F.2d 684, 686; Telling v. Bellows-Claude Neon Co., 6 Cir., 77 F.2d 584, 585; Hanley v. Pacific Live Stock Co., 9 Cir., 234 F. 522, 531. Whatever qualifying adjective may be used in the various opinions, they are unanimous that a heavy burden of proof rests upon the party urging contempt. We regard this rule as applicable here. With it in mind, we examine the evidence.

To establish its contention that the Independent is a Company-dominated continuation or successor of the Association, the Board urges the combined effect of the following: The domination of the plan and of the later Association; the laying of the groundwork for the dissolution of the Association and the launching of a successor (the Independent); the contemporaneous dissolution and purported disestablishment of the Association and launching of the Independent; the role of the leading figures in the Association in organizing the Independent; the Company supported the Independent by according it markedly

---

[3] While another matter is shortly presented in the brief, it is dependent upon the issue quoted.

[4] In the brief of the Board it is stated: "On the evidence as developed before the Master and on the facts as recited in Point I, the Board, had it had the responsibility of initially deciding the case, would have found, in line with a long body of decisions which lend clarity and meaning to the rights of employees under the Act, that the Independent is the alter ego or successor of the Association. Hence, if no decree had intervened and the case had been tried before the Board on a complaint issued under Section 10 of the Act, the Company would have been held to have dominated the Independent and would have been required to disestablish it. It would patently impair the enforcement machinery of the Act, if the obligations of the Company were held to be less under a decree than without it."

favorable treatment over Local B-412 in the matter of recognition; the Company supported the Independent by a check-off so applied as to accentuate the appearance of continuity between the Association and the Independent; and statements by the Company's supervisors favoring the Independent and disparaging Local B-412. The Board concludes that the above matters reveal "a subtle pattern of conduct in which an employer guilty of grave unfair labor practices fails, by adroit timing and deliberate maneuver, to remove the restraints flowing from the continued existence of an illegal union, with the result that an organization succeeds it which remains bound to the employer and which in truth is an essentially unchanged version of its predecessor." The first four of the above elements are so related that they can best be examined together.

Although the assembly of evidence by the Master is excellent, every word of this extensive record has been carefully read and considered. As to many essentials, there is no conflict in the evidence. Where there is conflict, the Master has found for respondents.

Our holding that the Association was violative of the Act was based upon a fact situation which was stated as follows (111 F.2d 340, 346, 347):

"Under the above recital of fact situation, it is clear that the Association was the successor of the Plan. By the very terms of the Association constitution, the Plan was to 'cease to exist' only when the constitution 'is adopted' and such adoption was to be effective only when the constitution had 'ratification by two-thirds of the chapters which were functioning as Councils under the Employes Representation Plan, heretofore in effect.' Also, such 'adoption shall constitute a reorganization of those Councils as Chapters of this Association'—plainly implying that the councils continued until the ratification of the constitution. Also, 'the Committeemen and Councilmen now serving under the Employes Representation Plan shall serve as Committeemen and Councilmen of this Association, until their successors can be elected'—such elections could not be held until the various chapters met and organized under the Association. The purpose and the effect of these provisions in the Association constitution were to prevent any hiatus between the Plan and the Association.

"It is true that the principal organizers of the Association as well as the company officials regarded the Plan as 'dead' because of the effect thereon of the National Labor Relations Act. However, there is no evidence that the great body of employees so regarded the situation. Even though requested to give notice that the Plan was defunct, the company had refused to take such action. This attitude of the company may have been prompted by the belief that it was improper (under the Act) for it to take any action connected with labor organization matters. However, it is not the motive influencing this company stand but the effect of such inaction upon the employees which is important in this situation. The very fact that a new association was being formed would naturally lead the employees to believe that a change from the Plan was being made but the very constitution of the new organization assured them that the Plan would continue until the new organization had been formed and the requisite number of chapter ratifications of the constitution had been secured.

"Considering that the Plan was entirely company conceived and supported; that all employees were required to be and, apparently, were members thereof; that the Plan had been in operation for about four years; that it became inoperative solely because of the Act; that the attitude of the company to the effect that the Plan had become inoperative was not brought to the attention of the employees prior to or during the campaign period of organization of the Association; that the constitution of the Association expressly provided for interim continuation of the Plan and of the representatives of the employees thereunder, we cannot say that the Board had no basis in the evidence for its inference that the employees were not as free from the influence of this situation as the Act contemplates they must be in choosing their bargaining agent."

In sharp contrast is the situation as to the Independent. Shortly after the decision of this Court became final, the Company notified the officers of the Association that it would comply with the order of the Board as approved by this Court, mailed notices to that effect to all employees and widely posted such notices throughout its property. This prompt and effective action left undone nothing which could reasonably be done to inform the

employees that the Company would no longer recognize and would have no further dealings with the Association and that the employees were entirely free to do as they wished concerning labor organization. The regional representative of the Board was informed of these steps by the Company. In fact, thereafter and until this contempt proceeding was begun, the Company was meticulously careful in informing the representative of its actions and dealings with its employees concerning labor matters and in following any suggestions made by the representative.

Promptly upon receiving this notice from the Company, the General Council of the Association passed a resolution dissolving the Association, as of the date of the meeting; providing for winding up of its affairs; and directing copy of the resolution to be mailed to each member of the Association. This resolution was promptly carried out. The funds of the Association were exhausted thereby and none passed to the Independent or to any of its organizers in any way. In view of the above actions by the Company and by the Association, there can be no contention that the employees were not fully informed as to the passing of the Association and of their right freely to act without Company domination or interference. This was prior to formation of the Independent.

In the beginning, two groups of employees arose, each having in mind the prompt organization of an independent union. One of these was led by W. R. Kent, who had been instrumental in formation of the Association. The other was led by Joseph H. Anway (a tester in the meter department), who had been a member of the Association but not an officer therein. While each of these groups had the same purpose, they were opposed. As stated by some witnesses, this opposition seemed founded on the idea of the Anway group that no officers or leaders in the Association should lead in organizing the new union.

The Kent group held a public meeting at Elmwood Hall on June 4th at which a committee was appointed to draft a constitution. The Anway group called a meeting at Ford Hall for June 7th.[5] Before the Ford Hall meeting, Anway sought legal advice in drafting a constitution from Levi Cisel. He, Gaskill (a meter tester) and Cisel drafted a constitution. Anway prepared membership cards. Anway arranged for Ford Hall meeting. He called meeting to order and read proposed constitution. Several hundred employees were present. Temporary chairman was elected; the constitution was discussed and approved; and a temporary organization of a board of five (as provided in the constitution) was elected to function until the permanent organization. None of the five had ever been an official in the Association and only one (C. A. Donnell) of the five elected to the Board had ever held any position in the Association. He had been simply on the Auditing Committee. One nomination (Wm. Nivert) for the Temporary Board was stricken, upon motion, "due to the fact he had been an officer in the old Association." No company officials of any grade were at the meeting. The expenses of the meeting were borne by Anway who was later reimbursed by the Independent. Cards of membership and accepting the constitution were circulated and signed. No officials of the Association participated in this meeting except to obtain signatures to membership cards.

The Board notified the Company that it represented a majority of all employees and demanded recognition of the Independent as bargaining representative for them. The Company made careful check of the signed membership cards and announced it would recognize the Independent but not as representing all of the employees since an election had been ordered by the Labor Board in the production department. The Temporary Board (assisted by Cisel) drew up forms of three contracts to submit to the Company. Company officials met with members of the Temporary Board of the Independent to consider the three contracts—a temporary bargaining contract, check-off contract, and seniority contract. The Company refused to sign any contract until after election in production department because it did not wish to do anything which might be considered as affecting that election. After that election and some further negotiations, the bargaining and check-off contracts were executed. Sometime later,

---

[5] The Kent group abandoned their separate movement and some of them, including Kent, attended the Ford Hall meeting. None of them participated in this meeting beyond attendance and securing signatures to membership cards.

a seniority contract was executed. About November 30, 1940, the permanent organization of the Independent was effected and has since functioned. During all of the above time, the company kept the regional representative of the Labor Board fully advised as to everything taking place between it and the Independent. In only one instance did the representative suggest any change and that was promptly carried out by the Company.[6]

The evidence contains no basis whatsoever for the contention that the Company, directly or indirectly, had any influence upon or any participation in the formation of the Independent or in its operations or actions or that the employees did not act freely with full knowledge of their rights.

It is urged that the Company supported the Independent by according markedly favorable treatment over Local B-412 of the I.B.E.W. in the matter of recognition. There is no evidence to support this position. During the pendency of the case in this Court, the Company refused to recognize the Local on the ground that the Company had recognized and had contracts with the Association and would not disturb that situation until this Court finally held the Association an illegal organization. It is difficult to see any wrong in such a position. Promptly after the decision of this Court became final, the Company notified the Local that the Association was ended and the Company was ready to treat with the Local. When representatives of the Local called upon the president of the Company to ascertain when he would be ready to start negotiations, he said he was ready to start that very day. At no time did the Company delay negotiations. It was some time before contracts with the Local were executed but the president of the Company testified (undisputed) the reason was the insistence of the Local upon a provision that, if the Company had any construction work for the Power Plant (the production department), the workmen would have to join the I.B.E.W. during the time they were engaged in such work. This kind of work was usually done by men affiliated with the Building Trades Council, A.F.L. Representatives of the Council stated they would not stand for such a provision. After considerable negotiation, the Company signed a contract and placed it in escrow until the I.B.E.W. and the Building Trades Council could iron out their differences. There is no evidence that the company at any time or in any way gave any preferential treatment to the Independent over the Local.

It is contended that the Company supported the Independent by a check-off so applied as to accentuate the appearance of the continuity between the Independent and the Association. The evidence is that the Company offered the Local the same check-off as given the Independent. The contention is stated as follows:

"On July 8, 1940, the Independent—following in this respect the example of its illegal predecessor—submitted three documents to respondent: (1) a temporary bargaining agreement, (2) a check-off contract; and (3) a seniority agreement. President Smith informed the temporary committee of the Independent at this time that he would not sign these agreements until after the election had been held in the Production Department. On July 15, Local B-412 won the Board election. On July 16, the Company executed the temporary bargaining agreement, confirming the recognition theretofore granted the Independent, and signed the Independent's check-off contract. The check-off agreement was in terms made applicable to the Production Department in utter disregard of the certified exclusive bargaining rights of Local B-412 in that department.

"On August 1, 1940, respondent deducted Independent dues from the wages and salaries of members in conformity with the check-off contract, including dues of members employed in the Production Department. The dues so deducted were for the months of June and July. The potent effect of this retroactive application of the check-off in adding to the appearance of continuity between the Association and the Independent can easily be seen

[6] Under the check-off contract with the Independent, the Company agreed to withhold dues of all members of the Independent. Some of these members worked in the production department. After certification by the Labor Board of representation of, the I.B.E.W. for the production department, the regional representative suggested that it was improper to check-off dues of such members of the Independent as worked in the production department. The Company promptly complied with this suggestion.

from the fact that dues were last checked off on behalf of the Association for April and May. Further contributing to the appearance of continuity was the fact that the pay-roll slips on which the deductions were noted bore the old Association stamp in explanation for the deduction."

The undisputed evidence is as follows: July 16, 1940, the check-off contract with the Independent was executed. This contract provided for a bi-monthly check-off of $1 from the pay of all members of the Independent who had given written authority therefor. "The first deduction to be made from the first pay after July 30, 1940 * * *." On July 31, (or August 1) the first check-off was made. Under the contract, this covered the preceding bi-monthly period June and July. This included 88 employees in the production department. At that time Local B–412 had been certified as bargaining representative for the production department employees. All of these 88, who were members of the Independent, had given written authorization to the Company to apply the check-off to them. Early in September, 1940, there was a conference between Mr. Sperry, the regional representative of the Labor Board, and a representative of the Company concerning inclusion of the above 88 production employees in the Independent check-off. As a result thereof, the Company requested a modification of the check-off contract in a letter sent the Independent wherein was stated:

"It is Mr. Sperry's opinion, concurred in by his Washington office, that this agreement, in so far as it relates to employees of the Production Department, is a violation of the National Labor Relations Act inasmuch as it is an attempt to bargain for employees who have designated another agency to represent them.

"In view of the fact that there is a question about the propriety of this contract, I think we ought to defer to the judgment of Mr. Sperry and discontinue the deduction of dues in the Production Department."

The Independent consented and the incident was closed.

█ It is difficult to see why a check-off as to these 88 men, who desired to be and remain members of Independent and who expressly authorized this check-off from their wages, could be a violation of the Act merely because another labor organization was the bargaining agent for the particular department where they worked. The Act requires no employee to be a member of the organization which has the majority and is, therefore, the bargaining agent. The Act protects the right of an employee to belong to any labor organization he chooses or to none at all. This record reveals that there are members of the Local among the employees as to whom the Independent is the bargaining agent. A check-off is purely a means of collecting dues. The check-off here depended upon the individual consent of the employee and was not compelled by the contract between the Association and the Company alone. Neither membership in a minority union, nor payment of dues thereto nor freely consented payment in any particular manner interferes with the right of the majority union, as bargaining agent, to act for all within its jurisdiction. But whether or not the objection of the regional representative be ultimately determined to be sound, it is certain that it is open to such serious question that action to the contrary cannot be fairly urged as reprehensible.

Nor is there any force in the suggestion that the circumstance that this first check-off covered June and July added "to the appearance of continuity between the Association and the Independent." The Independent was organized June 7. The check-off was based upon a bi-monthly period. The dues to be checked off were at the rate of fifty cents a month. What is unnatural, much less sinister, in the first check-off covering these two months?

Another suggestion is that the form of stamp (explaining the deduction) used upon the pay-roll slips further contributed to the "appearance of continuity" of the Independent and the Association. The undisputed evidence is as follows. During the life of the Association, the pay-roll slips for its members showed the amount of check-off for dues and a notation that such deduction was for dues of the "Association". For convenience, this notation was made by a rubber stamp. When the check-off was first made for members of the Independent, the same stamp was used by the employees whose duty it was to make out the slips. As soon as this was discovered by an official of the Company, the old stamp was destroyed and thereafter a new stamp was used showing

84

the deduction to be for dues of the Independent. The old stamp was used only as to the first check-off. Its use was, obviously, an inadvertence of the employees. It would be torturing facts to regard it as having any such significance as claimed by the Board.

It is urged that statements favoring the Independent and disparaging the Local were made by several supervisory employees. There is evidence of such. In every instance, this was denied by evidence. The Master has fairly considered the evidence as to each instance and has found either that the particular statement was not made or that the evidence fails to establish that it was. We have been given no sufficient reason to overrule any of these findings.

The contention that all of the evidence shows that "the Independent embodies the restraints upon the exercise of the rights of self-organization inherent in the Association" is without support in the evidence. Not only has the Board failed to sustain the burden of proof required in contempt proceedings but it has failed in any showing of violation of the decree of this Court or of the order enforced by that decree.

Respondents will stand discharged of contempt and the petition will be dismissed.