Ruby Jackson GAINER, Member of Class
Represented by William J. Bolden,
Plaintiff,

v.

SCHOOL BOARD OF JEFFERSON
COUNTY, ALABAMA, and J. E. Bryan,
Superintendent of Schools of Jefferson
County, Alabama, Defendants.

Civ. A. No. 5339.

United States District Court
N. D. Alabama, S. D.

Nov. 4, 1955.

**560**

Crampton Harris, George S. Brown, and Arthur D. Shores, Birmingham, Ala., for plaintiff.

Deramus, Fitts, Johnston & Mullins and Harvey Elrod, Birmingham, Ala., for defendants.

LYNNE, Chief Judge.

A final decree of this Court, entered by and with the consent of the parties and enrolled herein on April 27, 1945, terminated the class action of Negro teachers in the schools of Jefferson County, Alabama, which had been instituted on March 27, 1942, by the filing of the complaint[1] of William J. Bolden, as the only named plaintiff against School Board of Jefferson County, Alabama, and J. E. Bryan, Superintendent of Schools of Jefferson County, Alabama (sic), as defendants.

In its decretal order, this Court, having adverted to Alston v. School Board of City of Norfolk, 4 Cir., 1940, 112 F.2d 992, 130 A.L.R. 1506, declared: "That any official policy of the defendants in paying plaintiff and all other Negro teachers and principals in the public school system of Jefferson County, Alabama, smaller salaries than are paid by said defendants to white teachers and principals, in so far as (sic) such differentials are predicated solely on race or color, is unlawful and unconstitutional, and is in violation of the equal protection clause of the Fourteenth Amendment and of Sections 41 and 43 of Title 8 of the United States Code." (Now codified as 42 U.S.C.A. §§ 1981 and 1983.)

Thereupon it was adjudicated: "(1) That the defendants, School Board of Jefferson County, Alabama, and the agents of said defendants and each of them be and are hereby perpetually enjoined and restrained from discriminating in the payment of salaries, against the plaintiff and any other Negro teachers and principals in the public school system of Jefferson County, Alabama, on account of race or color. (2) The operative effect of this Decree is postponed

---

1. The prayer of the complaint was:
"Wherefore, plaintiff respectfully prays the Court that upon filing of this complaint, as may appear proper and convenient to the Court, the Court advance this cause on the docket and order a speedy hearing of this action according to law, and that upon such hearing:

"(1) That this Court adjudge and decree, and declare the rights and legal relations of the parties to the subject matter here in controversy, in order that much declaration shall have the force and effect of a final judgment or decree.

"(2) That this Court enter a judgment or decree declaring that the policy, custom or usage of the defendants in paying plaintiff and other Negro teachers and principals of equal qualifications and experience, and performing essentially the same duties and services, solely because of their race or color, is a denial of the equal protection of the laws graranteed by the Fourteenth Amendment of the United States Constitution and is therefore unconstitutional and void.

"(3) That this Court issue a permanent injunction forever restraining and enjoining the defendants and each of them from making any distinction solely on the grounds of race and color in the fixing of salaries paid white and colored teachers and principals employed in the public schools of Jefferson County, Alabama.

"(4) That this Court issue a permanent injunction forever restraining and enjoining the defendants and each of them from paying to plaintiff or any other colored teacher or principal employed by them a less salary than they pay any white teacher or principal employed by them with equal qualifications, certification, experience and filling an equivalent position in the public schools of Jefferson County, Alabama, because of race or color.

"(5) Plaintiff further pray that the Court will allow them their costs herein and such further, other, additional or alternative relief as may appear to the Court to be equitable and just." (sic)

until the school term beginning September, 1945."

Thereafter, on July 27, 1945, the Board adopted a scale of minimum salaries for teachers.[2] Experience under the new schedule was not satisfactory to some of the Negro teachers affected and the instant ancillary proceeding evolved.

On February 17, 1947, Ruby Jackson Gainer, a member of the class represented by Bolden, filed a petition for rule to show cause why the respondents Board, its constituent members and J. E. Bryan, as Superintendent, should not be punished for contempt.

Petitioner alleged, *inter alia*, that respondents had "knowingly and wilfully disobeyed," and were still disobeying, the order of April 29, 1945, in that the respondents continued to pay Negro teachers less than was paid to white teachers "having similar qualifications [and] experience [and] performing similar duties, solely on account of race or color

* * *." The new salary schedule was attacked in particular paragraphs in the petition. The original prayer was only for a rule to show cause why respondents should not be subjected to an attachment in contempt of court.

By amendment, however, petitioner prayed for a decree holding respondents in contempt of court, imposing a fine "upon the defendants payable to the petitioners separately and severally in an amount sufficient to compensate the petitioners for the differences between what they have been paid since the beginning of the school year 1945 and what they would have been paid since that time had not the unlawful and unconstitutional discrimination * * * on the part of the defendants been perpetrated," and awarding "petitioners a reasonable attorney's fee and their necessary expenses and costs incurred in this contempt proceeding." There was also a prayer for general relief.

2. "Minimum Monthly and Annual Salary To Be Paid To Teachers In Order To Participate In the State Minimum Program Fund and Minimum Salary for Jefferson County.—1945–46

**1.** Advancement Scale of Monthly Salaries
(Scholastic Month)

**1.** Teachers

Beginning with the 1945–46 scholastic year, the following scale of minimum salaries for each rank shall apply to all teachers employed by the Jefferson County Board of Education.

| | (State) | (County) | |
| --- | --- | --- | --- |
| Rank of Certificate | Minimum Monthly | Degree | Monthly |
| I | $110. | M.A., M.S., (Approved) | $125. |
| II | 100. | A.B., B.S., (Approved) | 115. |
| | | A.B., B.S., (unapproved) (Rank II Certificate) | 100. |
| III | 85. | | |
| IV | 75. | Non-degree and Emergency | 85. |
| V | 65. | | |

A teacher may be contracted for at a monthly salary in excess of the county's minimum salary, if, in the judgment of the county superintendent of education and the county board of education, the professional qualifications and merits of said teacher justifies a salary in excess of the minimum, or if the supply and demand for teachers is such that it is necessary to pay salaries in excess of the minimum to secure the services of teachers with the desired training and professional qualifications.

Any and all teacher-salary scales in conflict with the above are hereby repealed."

There was an effort to add, by amendment, some 379 parties-plaintiff. Following a motion by respondents to strike certain named parties plaintiff, and all parties who had been listed on petitioners' prior amendment without their consent, petitioners further amended by striking the names of some 175 Negro teachers as 'parties-plaintiff and by adding the names of 3 Negro teachers.

When issue was joined in behalf of respondents, an informal conference was held in chambers, in the course of which there was complete harmony of opinion among court and counsel of record that a special master should be appointed in the pending proceeding, as authorized by Rule 53, Fed.Rules Civ.Proc. 28 U.S.C.A., and that the master should be directed to report his findings of fact and conclusions of law within the periphery of the issues suggested by the pleadings.

Counsel were requested to attempt to agree upon an attorney, generally esteemed by members of the bench and bar for both pre-eminent professional ability and impeccable integrity; who might serve in such capacity. Their joint announcement of agreement upon Honorable Reid B. Barnes, of Birmingham, was most gratifying to the Court, and his appointment as special master ensued.

The order of reference, dated April 25, 1947, contains 15 numbered paragraphs, constituting explicit directions to the master. With the exception of paragraph 3, to which petitioners excepted, they represent the concurrent views of court and counsel upon the scope and the terms of such order.

On September 16, 1953, the master filed his report, consisting of 208 typewritten pages. Contemporaneously therewith, both petitioners and respondents filed and served their respective written objections thereto. Unlimited time was afforded for oral arguments after counsel had favored the Court with exhaustive and excellent briefs.

For convenient reference, there is reproduced in a footnote [3] the numbered

---

**3.** **1.** What salaries were paid to the plaintiffs from and after the effective date of the decree dated April 29, 1945, in this cause.

Master's Response: In tabular form in five columns headed respectively, "name", "school year", "rate per month", "total months paid" and "total paid", the master has found and reported salaries paid to the plaintiffs named in the amended petition for the two school years, 1945–46 and 1946–47.

2. Whether or not there were in fact differentials in salaries paid white and Negro teachers under the salary schedules of teachers adopted by the School Board of Jefferson County and in effect during the period involved.

Master's Response: After commenting upon the existence of differentials in salaries paid teachers in the Jefferson County School System which appear from the face of the salary schedules adopted, such as classification of teachers according to degree and the fixing of minimum salaries corresponding thereto, the master proceeded to a detailed analysis of such differentials, implementing his discussion with exhaustive statistical information. He noted that the Superintendent of Education employed 16 "steps" or increments within each separate classification for teachers, appearing in the salary schedule adopted. He found that aside from the differentials to which reference has been made, the only differential which he could find or infer from the evidence was that arising out of the discrepancy between the "step" and corresponding salary on the one hand, and the years of experience in teaching on the other. He found as a fact that neither the Board nor the County Superintendent employed as a salary schedule a separate schedule for either white or Negro teachers as a group. He found as a fact that, except for the classification of "bachelor approved" teachers, the salaries of white teachers were not fixed by graduating them upon the actual years of experience in a salary scale and that the same test, plan and schedule applied in determining the salaries of white teachers were also applied in determining the salaries of the Negro teachers.

3. Whether said differentials, if any, during the aforesaid period were predicated solely on race and color.

Master's Response: In an elaborate response to the foregoing question, occupying 92 written pages, properly applying the law as to burden of proof and presumptions, the master found as a fact that the differentials between the salaries

paragraphs of the order of reference and under each paragraph the Court's summary of the master's response thereto. In the interest of brevity, conclusions have been distilled from the master's elaborate, but precise, findings of fact.

Striving to confine the compass of this opinion, to avoid a fruitless exercise in dialetics, in short, to decide only that which is necessary, the Court accepts the assurance of petitioners' counsel that what, and all that, is sought by way of relief here is reparation. At the hear-

paid to the white and Negro teachers in each classification were not predicated solely on race and color. On the contrary, he found as a fact that such differentials were predicated upon qualitative factors and criteria acceptable to the courts, except as to teachers in the "bachelor approved" classification. Adverting to the fact that not a one of the white teachers within this category was placed on a "step" in the salary scale lower than the years of his teaching experience, while many of the Negro teachers were, the master concluded that the burden of going forward with the evidence shifted to the Board to show that each white teacher met the incommensurable tests which enter into evaluation of teacher worth. In other words, the master concluded that he could not infer that all white teachers, without exception, were good and able. Since the Board did not demonstrate by the evidence that the Negro teachers placed on "steps" lower than their years of teaching experience were deficient in qualifications, he concluded that existing differentials in salaries paid to white and Negro teachers in this category were predicated upon conditions which pertained to "bachelor approved" Negro teachers as a class and did not pertain to the identical class of white teachers. He emphatically found that the maintenance of such differentials was not due to a design on the part of the Board to discriminate against Negro teachers on account of their race or color but was the result merely of fixing their salaries with reference to "steps" on the salary scale after consideration of conditions which applied to them as a class and did not apply to white teachers of the same class.

4. Whether the defendants in payment of salaries during the aforesaid period have discriminated in any way against the plaintiffs on account of race or color.

Master's Response: The master found as a fact that there was a discrimination against plaintiffs of the class of teachers with degrees from institutions approved by the Southern Association of Colleges and Secondary Schools, on account of conditions pertaining to teachers of that class and race, who were placed in a

"step" on the salary scale of a number less than the number of years of prior teaching experience in the county system, for the two school years 1945–46 and 1946–47.

5. The amount of the difference between what each plaintiff has been paid since the beginning of the school year 1945 and what each plaintiff would have been paid had the decree of April 29, 1945, been complied with by the defendants. In the event you find such non-compliance.

Master's Response: In tabular form the master found the names of these plaintiffs, their schools and, under each of the school years, the amount of the difference between what each of these plaintiffs was paid in salary and what each would have been paid had each been placed in a "step" on the salary scale equal to the number of the years of experience of that plaintiff in the county system prior to the school year involved. Such differences aggregate the total sum of $2,970.

6. What effect, if any, does any written contract executed by a plaintiff, by which a salary was agreed upon, have upon such plaintiff's compensation in this proceeding.

Master's Response: After a full discussion of applicable principles of law, the master expressed the opinion that the Board would not be liable either *ex contractu* or *ex delicto* on account of any discrimination of its members or officers if and when made, and, that being true, the written contract of the teacher is the sole measure of compensation or right of damages if the teacher is not paid. In this discussion the question of liability in proceedings in civil contempt was deferred to the discussion under paragraph 14.

7. What standards were used during the aforesaid period in evaluating teachers, both white and Negro, for the purpose of fixing their salaries.

Master's Response: Fully answered under the response to paragraph 3.

8. What schedules were adopted by the defendants to govern the payment of salaries to teachers, both white and Ne-

ings before the master, reiterated in briefs and in oral arguments before the Court, counsel disclaimed any relief by way of assessment of a fine against or imprisonment of the individual members of the Board or the Superintendent. They insist upon the sanction of a fine, as for civil contempt to compensate petitioners for losses and damages sustained by them resulting from noncompliance with this court's decree, to be assessed only against respondent Board, a juridical entity.[4]

Thus relegated to irrelevancy are questions pertaining to the full sweep and scope of the court's power to vindicate its authority through enforcement of its decree. It is quite apparent that a denial of the narrow relief sought by petitioners in this proceeding would not be tantamount to an acknowledgment of impotency in a different situation.

Abhorring a vacuum, courts will declare legal principles only as they arise out of facts. If there had been no discrimination, forbidden by law, practiced by the Board against the petitioning parties herein, the matter would be at an end and there would be no warrant for indulging in an academic discussion of whether the remedy sought is in any event available.

Turning to the master's report, the Court discerns basic findings of fact which, if adopted, require definitive application of established propositions of law. For the master found that, during the two school years involved, differentials existed in salaries paid to the class of white and Negro teachers holding bachelor degrees from "approved institutions",[5] and were predicated upon con-

gro, for the school years 1945–46 and 1946–47.

Master's Response: The salary schedule formally adopted by the Board is set out in the response to paragraph 2, supra. The 16 "steps" used by the Superintendent in recommending salaries was never formally adopted by the Board, but the Board knew of its use and acquiesced therein.

9. With respect to each school year, what percentage of white teachers received as much as or more than they were entitled to under the aforesaid schedule.

Master's Response: Fully answered under paragraph 3.

10. With respect to each school year, what percentage of Negro teachers received as much as or more than they were entitled to under the aforesaid schedules.

(a) What part of said percentage represents new teachers.

Master's Response: Fully answered under paragraph 3.

11. What plaintiffs during each school year rendered special services, other than teaching, for which they were paid extra compensation.

(a) With respect to each such plaintiff what special services were rendered and what special compensation was paid therefor.

Master's Response: This paragraph was eliminated by agreement of counsel.

12. The amount of a reasonable attorney's fee for the plaintiffs in this proceeding, if the same be recoverable.

Master's Response: By agreement of counsel the execution of this paragraph of reference was deferred until after decision under the other paragraphs.

13. The amount of the necessary expenses and costs incurred by the plaintiffs in this proceeding, if the same be recoverable.

Master's Response: The sums testified to by Mr. Thomas, the accountant, for accounting services are reasonable, but the necessity for such calculations is doubtful. The court reporter's bill as rendered is a reasonable and necessary expense.

14. Whether the defendant, County Board of Education, is immune from a proceeding in civil contempt by reason of disobedience of an injunction issued by this Court.

Master's Response: The master expressed the opinion that as a matter of law the Board, as a juridical entity, was not liable in monetary damages in this proceeding in civil contempt.

15. Determine which plaintiffs are properly joined as parties hereto.

Master's Response: The master found that those persons named as parties plaintiff in the amended petition are properly joined as parties hereto.

4. Code of Alabama 1940, Title 52, § 99.

5. The terms "approved institutions" and "bachelor approved", as employed in the master's report and the briefs and arguments of counsel, refer to educational in-

ditions which pertained to "bachelor approved" Negro teachers as a class and did not pertain to white teachers of the same class. The master recognized, as does the Court, that such practice constituted discrimination of an arbitrary nature, forbidden by the equal protection clause of the Fourteenth Amendment, and that ordinarily "The absence of wilfulness does not relieve from civil contempt." [6] He expressed no opinion as to whether it was inconsistent with and violative of the injunctive order concerned, which restrained a discrimination based solely on race or color. The Court holds that it was.

At first blush it would seem that, in view of the ultimate conclusion reached by both master and Court, other findings of fact relating to differentials in salary and the reasons therefor might be ignored in this opinion as only the one springboard is required to launch it. However, vigorous assaults from both quarters upon fact findings conceived to be adverse to the contending parties, respectively, deserve some attention.

Marshaling an imposing array of statistics and deriving therefrom a multitude of percentages by way of comparison and contrast, able counsel for petitioners seek to demonstrate that the adoption of the salary schedule itself was conceived in iniquity and born in infamy. They labor mightily the insistence that it, and its application during the significant period, constituted a scheme or device confected by respondents to thwart the solemn decree of this Court. But they may be reminded that neither the order of court nor the law of the land upon which it was rested "turn matters that are inherently incommen-

surable into mere matters of arithmetic." [7]

For their part, able counsel for respondents, with equal vigor, assail the master's findings and conclusions with respect to the class of "bachelor approved" teachers, urging that the master drew unauthorized inferences from a fortuitous concourse of statistics relating to years of teaching experience and gave little or no consideration to other substantial elements which must be taken into account in evaluating the worth of teachers. The short answer to this insistence is that respondents failed to produce such testimony when, as the master properly found, it became their burden to go forward with the evidence.

It is required by Rule 53(e) (2), F.R.C.P., that "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." The language of the rule is plain and simple. If interpretation is sought, opinions dealing with the identical "unless clearly erroneous" phrase in Rule 52(a), F.R.C.P., are helpful. This Court has no right "to substitute its judgment on disputed issues of fact for that of the [master] where there is substantial credible evidence to support the finding",[8] unless it was induced by an erroneous view of the law.[9] Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by him who sees and hears them.[10]

Obviously, considerations of motive, design and intent are of paramount concern in determining whether the salary schedule adopted by the Board and the addition thereto of the 16 "steps" or increments in each class, which it sanc-

stitutions approved by the Southern Association of Colleges and Secondary Schools, a generally recognized independent agency for rating colleges in the South.

6. McComb v. Jacksonville Paper Co., 1949, 336 U.S. 187, 69 S.Ct. 497, 499, 93 L.Ed. 599.

7. Cassell v. State of Texas, 1950, 339 U.S. 282, 70 S.Ct. 629, 634, 94 L.Ed. 839.

8. Sanders v. Leech, 5 Cir., 1946, 158 F.2d 486, 487.

9. Cleo Syrup Corp. v. Coca-Cola Co., 8 Cir., 1943, 139 F.2d 416, 150 A.L.R. 1056.

10. United States v. Yellow Cab Co., 1949, 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150.

tioned and which were consistently made the basis for the salary actually paid, was nondiscriminatory, as it appeared to be on its face, or whether it was, as petitioners insist, a device for evasion. The master clearly understood and applied the presumptions which traditionally obtain in favor of a classifying agency in equal protection cases and the heavy burden of proof upon petitioners in a contempt proceeding.[11]

■ Implicit in the master's findings of fact is his recognition that the Superintendent, at the beginning of the school year, recommended the salary to be paid to each teacher in the county system and that the Board invariably acquiesced. With respect to each category, except the "bachelor approved" class he found that the "step" which each teacher, whether white or Negro, was to occupy on the applicable salary scale was determined after a complicated process of teacher evaluation, with its constant impingement of the qualitative upon the quantitative. Thus, with regard to each of such teachers, the master found that in fixing his proposed salary the Superintendent took into account not only his education and years of experience but also the variable qualitative factors of ability and personality.[12] Finding the respective classifications to have been lawful and the salary differentials to have been based upon permissible criteria wholly apart from considerations of race or color, the master properly concluded that there was no violation of the Court's order with respect to them.

■ Agreeing with the master, for the reasons so ably stated by him, that differentials in the salaries paid white and Negro teachers in the "bachelor approved" class represented results of arbitrary discrimination, though without bad or evil motive, and holding that, in the final analysis, they were predicated solely on race or color, the Court concludes that a case for civil contempt has been made out. May the Court assess a fine against the Board in the amount of $2,970 to compensate the parties-plaintiff in the offended class for salaries lost as a result of its disobedience of the injunction?

School teacher cases in the federal courts are of no aid in solving the question posed.[13] Referring to Roles v.

11. Borden's Farm Products Co. v. Baldwin, 1934, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281; Neal v. State of Delaware, 1880, 103 U.S. 370, 26 L.Ed. 567; Norris v. State of Alabama, 1935, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; Pacific States Box & Basket Co. v. White, 1935, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138; Corporation Commission of Oklahoma v. Lowe, 1930, 281 U.S. 431, 50 S.Ct. 397, 74 L.Ed. 945; Metropolitan Casualty Ins. Co. of New York v. Brownell, 1935, 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070; Tarrance v. State of Florida, 1903, 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572; Lawrence v. State Tax Commission, 1932, 286 U.S. 276, 52 S.Ct. 556, 76 L.Ed. 1102; Sunday Lake Iron Co. v. Township of Wakefield, 1918, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154; Kansas City Power & Light Co. v. National Labor Relations Board, 8 Cir., 1943, 137 F.2d 77; National Labor Relations Board v. Standard Trouser Co., 4 Cir., 1947, 162 F.2d 1012; National Labor Relations Board v. Tupelo Garment Co., 5 Cir., 1941, 122 F.2d 603; Fox v. Capital Co., 3 Cir., 1938, 96 F.

2d 684; Electro-Bleaching Gas Co. v. Paradon Engineering Co., D.C.E.D.N.Y. 1926, 15 F.2d 854.

12. Similar criteria have been approved as a proper basis for lawful classification. See e. g. Reynolds v. Board of Public Instruction, 5 Cir., 148 F.2d 754; Turner v. Keefe, D.C.S.D.Fla.1943, 50 F.Supp. 647; Morris v. Williams, 8 Cir., 1945, 149 F.2d 703.

13. Alston v. School Board of City of Norfolk, 4 Cir., 1940, 112 F.2d 992, 130 A.L. R. 1506; McDaniel v. Board of Public Instruction, D.C.N.D.Fla.1941, 39 F. Supp. 638; Whitmyer v. Lincoln Parish School Board, D.C.W.D.La.1948, 75 F. Supp. 686; Mills v. Lowndes, D.C.Md. 1939, 26 F.Supp. 792; Mills v. Board of Education of Anne Arundel County, D.C. Md.1939, 30 F.Supp. 245; Thompson v. Gibbes, D.C.E.D.S.C.1945, 60 F.Supp. 872; Cook v. Davis, 5 Cir., 1949, 178 F. 2d 595; See also: Cases in Note 12. Freeman v. Chesterfield County School Board, D.C.E.D.Va.1948, 82 F.Supp. 167, affirmed, 4 Cir., 171 F.2d 702.

School Board of City of Newport News, D.C.E.D.Va.1945, 61 F.Supp. 395, counsel for petitioners comment in their brief: "The Roles case, supra, stands on all fours with this one. The Special Master dismisses it as of no authority. It is the only case we have been able to find which is in direct point in this contempt proceeding. We regard it as a well reasoned opinion and rely upon it." A copy of the decree entered therein on August 29, 1945, in conformity with the Court's opinion, was obtained by counsel and furnished to this Court. By that decree the Court adjudged the defendants Board and Superintendent to stand in civil contempt of court, ordered the defendant Board to pay the named Negro teachers stipulated sums of money, with interest, to pay plaintiffs' counsel attorneys' fees, and to pay costs of court.

Correspondence with attorneys of record for the defendant Board in the Roles case, conducted by counsel for respondents herein, elicited information that that decree was based upon an unrecited consensual arrangement. None of the questions to be hereinafter considered were raised or discussed. Therefore, the Court understands and shares the master's opinion that Roles is no authority of even faint persuasion.

In proper focus now, the critical query is simply stated: May the court impose a compensatory, monetary fine upon the Board as an entity, as distinguished from the individual members thereof, which must necessarily be paid out of the public funds or property of the State of Alabama [14] in this civil contempt proceeding, on account of its violation of the injunction? It is now proposed to demonstrate that it may not.

An excellent analysis of the distinction between proceedings in civil and in criminal contempt is found in Parker v. United States, 1 Cir., 1946, 153 F.2d 66, 163 A.L.R. 379. The United States Supreme Court cases collected in that opinion lead this Court to hold that petitioners' rights herein, as civil litigants, are dependent upon the basic controversy.[15]

Anything that would serve as a bar to the establishment by petitioners of a liability at law or in equity against the Board for a compensatory money judgment in the absence of violation of an injunction would also bar recovery thereof in a civil contempt proceeding based upon the violation of an injunction. To state the proposition with a degree of similarity appropriate to the ensuing discussion, if petitioners, in the beginning, could not have maintained successfully against the Board an action at law or in equity to recover the compensation they are here seeking, without regard to an injunction, they are not entitled to the award herein of a compensatory fine, the sole measure of recovery.

For the school years concerned, each offended petitioner entered into a contract with the Board.[16] Any original action *ex contractu* or *quasi ex contractu*, which might have been instituted in their behalf, manifestly would not have proceeded upon the theory of the breach of such express contract, because in each instance the stipulated salary was paid and received. Therefore, of necessity, any such cause of action must have been predicated upon breach by the Board of an implied promise—not a promise to pay the reasonable value of the services rendered, but to pay what would have been paid had there been no denial of equal protection of the laws in contravention of the Fourteenth Amendment.

Forced to rely upon an implied contract, to contend that the express contract between the parties was void, or at least voidable, because infected with constitutional infirmity, and to insist that the court must imply a promise

---

14. See Note 25, infra.

15. See also United States v. United Mine Workers, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884.

16. Authority of the Board to enter into contracts is spelled out in Code of Alabama 1940, Title 52, § 99. This section also contains the familiar to "sue and contract" clause.

to pay more than the agreed amount against the expressed intention of the parties, it follows that, in form, such action must have been in general assumpsit as for breach of a promise implied in law [17] as distinguished from one implied in fact [18] or in debt.[19]

Extended research has failed to produce a single case allowing recovery in an action in general assumpsit or debt on the theory of breach of an implied promise arising out of the violation of fundamental rights protected by the due process clause of the Fifth Amendment, the guarantee of due process under the unwritten constitution of Great Britain, or the equal protection clause of the Fourteenth Amendment.

In Hague v. Committee for Industrial Organization, 3 Cir., 1939, 101 F.2d 774, 779, it was held that the statutory causes of action,[20] which are provided for the deprivation of civil rights, sound in tort and that, in a proper case, a jury may award exemplary or punitive damages. But while pecuniary liability may attach for the breach of a duty imposed by the constitution or by legislative fiat, it does not follow that it may be rested upon breach of an implied promise where neither constitutional provision nor statute purports to establish or define any standard for the admeasurement of such liability.

This Court holds that in the basic controversy there was never available to petitioners a cause of action *ex contractu* or *quasi ex contractu* for damages against the Board on the theory of breach of a promise implied in law springing from a denial to them of equal protection of the laws.

More troublesome is the examination of principles relevant to the question as to whether, in the beginning, petitioners might have recovered the monetary award here sought in an action *ex delicto*. To preface the succeeding remarks, it should be re-emphasized that petitioners seek nothing of the individual members of the Board and, therefore, any consideration of their individual liability is pretermitted.

Great care must be observed in analyzing the opinions of the appellate courts

---

17. 38 Am.Jur. § 15 at pages 193 and 194; 12 Am.Jur. § 6, at page 504.

For holdings of the Supreme Court of Alabama that a municipal corporation may be subjected to liability and suit on account of a contract or promise implied purely in law, see General Electric Co. v. Town of Ft. Deposit, 1911, 174 Ala. 179, 56 So. 802 (the theory is unjust enrichment); Allen v. Intendant & Councilmen of LaFayette, 1899, 89 Ala. 641, 8 So. 30, 9 L.R.A. 497 (unjust enrichment); Hunter v. City of Mobile, 1943, 244 Ala. 318, 13 So.2d 656 (a taking of private property by a city under its power of eminent domain [not a common trespass] under a constitutional provision requiring payment and providing the standard of just compensation).

Illustrative of the proposition that the law does not imply a promise merely from the fact that the law imposes a duty is Fuller v. Duren, 1860, 36 Ala. 73.

18. It is axiomatic that "A meeting of the minds is as essential to the existence of a contract implied in fact as it is to an express contract." Johnson County Savings Bank v. City of Creston, 1930, 212 Iowa 929, 231 N.W. 705, 707, 237 N.W. 507, 84 A.L.R. 926.

Illustrative of a situation wherein recovery in general assumpsit is allowed against a county board of education upon a promise implied in fact is the case of Greeson Mfg. Co. v. County Board of Education, 1928, 217 Ala. 565, 117 So. 163, 164. There the board had accepted and used materials for "legitimate, authorized purposes", i.e., the construction of a school building. The express promise to pay the agreed price was unenforceable because of the board's failure to record a resolution to that effect as required by law.

19. See, e.g., Blackburn v. Baker, Ala.Sup. Ct.1838, 7 Port. 284; Russell v. Irby 1848, 13 Ala. 131; Higdon v. Kennemer, 1897, 120 Ala. 193, 24 So. 439; Rogers v. Brooks, 1892, 99 Ala. 31, 11 So. 753.

See also Shipman, on Common Law Pleading, Third Edition, Hornbook Series, at pages 137, 169 and 97.

20. 42 U.S.C.A. §§ 1983 and 1985.

of the United States [21] and of the several states [22] pertinent to the potential tort liability of a municipal or quasi public corporation resulting from the acts or omissions of its officers or agents. In each case, the act or omission complained of must be subjected to an objective, factual test to determine whether it was committed or occurred in the exercise of a governmental function, on the one hand, or of a corporate or proprietary function on the other.

It would seem that a mere casual meditation upon the statutory system of public education, created by the legislature in obedience to the mandate of Section 256, Article XIV, Constitution of Alabama, with particular reference to the powers and duties delegated to boards of education within the geographical divisions of counties [23] would impel the conclusion that such boards, as juridical entities, while undertaking to administer the affairs of that segment of the system entrusted to them, are engaged in performing a purely governmental function.

All that this or any other court could say with reference to the office of a public school system in an organized society was tersely summed up in, and doubts that heretofore may have arisen on that score were laid at rest by, a single sentence in Brown v. Board of Education,

21. Lynch v. United States, 1934, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434; Schillinger v. United States, 1894, 155 U.S. 163, 15 S.Ct. 85, 39 L.Ed. 108; County of Lincoln v. Luning, 1890, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766; State of North Dakota v. National Milling & Cereal Co., Inc., 8 Cir., 1940, 114 F.2d 777; Murray v. Wilson Distilling Co., 1909, 213 U.S. 151, 29 S.Ct. 458, 53 L.Ed. 742; Folsom v. Township of Ninety Six, 1895, 159 U.S. 611, 16 S.Ct. 174, 40 L.Ed. 278; Graham v. Folsom, 1906, 200 U.S. 248, 26 S.Ct. 245, 50 L.Ed. 464; Hopkins v. Clemson College, 1911, 221 U.S. 636, 31 S.Ct. 654, 55 L.Ed. 890; Christian v. Atlantic & North Carolina R. Co., 1890, 133 U.S. 233, 10 S.Ct. 260, 33 L.Ed. 589; Cunningham v. Macon & Brunswick R. Co., 1883, 109 U.S. 446, 3 S.Ct. 292, 609, 27 L.Ed. 992; Ex parte State of New York, 1921, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057; Ford Motor Co. v. Department of Treasury of State of Indiana, 1945, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389; Ballaine v. Alaska Northern R. Co., 9 Cir., 1919, 259 F. 183, 8 A.L.R. 990; Hagood v. Southern, 1886, 117 U.S. 52, 6 S.Ct. 608, 29 L.Ed. 805; State of Louisiana ex rel. Elliott v. Jumel, 1883, 107 U.S. 711, 2 S.Ct. 128, 27 L.Ed. 448; In re Ayers, 1887, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216; Smith v. Reeves, 1900, 178 U.S. 436, 20 S.Ct. 919, 44 L.Ed. 1140; State of Missouri v. Fiske, 1933, 290 U.S. 18, 54 S.Ct. 18, 78 L.Ed. 145; Nassau Smelting & Refining Works v. United States, 1924, 266 U.S. 101, 45 S.Ct. 25, 69 L.Ed. 190; Beers, for Use of Platenius v. State of Arkansas, 1857, 20 How. 527, 61 U.S. 527, 15 L.Ed. 991; Hans v. State of Louisiana, 1890, 134 U. S. 1, 10 S.Ct. 504, 33 L.Ed. 842; Duhne v. State of New Jersey, 1920, 251 U.S. 311, 40 S.Ct. 154, 64 L.Ed. 280.

22. Turk v. Monroe County Board of Education, 1930, 222 Ala. 177, 131 So. 436; White v. Alabama Insane Hospital, 1903, 138 Ala. 479, 35 So. 454; City of Birmingham v. Brock, 1942, 242 Ala. 382, 6 So.2d 499; City of Anniston v. Hillman, 1930, 220 Ala. 505, 126 So. 169; Hawkins v. State Board of Adjustment, 1942, 242 Ala. 547, 7 So.2d 775; Maia v. Eastern State Hospital, 1899, 97 Va. 507, 34 S. E. 617, 47 L.R.A. 577; Moody v. State's Prison of North Carolina, 1901, 128 N. C. 12, 38 S.E. 131, 53 L.R.A. 855; State, Use of Meddle, v. Board of School Commissioners, 1902, 94 Md. 334, 51 A. 289; Leavell v. Western Kentucky Asylum, 1906, 122 Ky. 213, 91 S.W. 671, 4 L.R.A., N.S., 269; Overholser v. National Home, 1903, 68 Ohio St. 236, 67 N.E. 487, 62 L. R.A. 936; School District No. 48 of Maricopa County v. Rivera, 1926, 30 Ariz. 1, 243 P. 609, 45 A.L.R. 762; Howard v. City of Worcester, 1891, 153 Mass. 426, 27 N.E. 11, 12 L.R.A. 160; Ford v. Kendall Borough School District, 1888, 121 Pa. 543, 15 A. 812, 1 L.R.A. 607; Freel v. School City of Crawfordsville, 1895, 142 Ind. 27, 41 N.E. 312, 37 L.R.A. 301; 38 Am.Jur. § 572, p. 261. Note, "Liability of school district or school corporation to actions for damages from negligence," 1897, 37 L.R.A. 301. Note, "Liability of school district or school corporation for tort," 1914, 49 L.R.A.,N. S., 1026.

23. Code of Alabama 1940, Title 52, Chapter 5, § 62 ff.

1954, 347 U.S. 483, 74 S.Ct. 686, 691, 98 L.Ed. 873, viz.: "Today, education is perhaps the most important function of state and local governments."

Acting within the ambit of its delegated powers, it entered into contracts with teachers,[24] in which their salaries were fixed, and it caused the payment of such salaries to be paid out of public funds of the State of Alabama,[25] funds which its members are enjoined by law from diverting from purposes for which they were appropriated.[26] Can it be doubted that, while thus performing its duties within the scope of its express authority, the Board was an agency of the State of Alabama, endowed with its sovereign immunity from suit?

█ To hold that the Board, as a corporate entity, would be liable in pecuniary damages, to be satisfied out of public funds, for the tortious conduct of its individual members in wilfully and arbitrarily discriminating against any class of teachers in establishing and paying their salaries in violation of the Fourteenth Amendment, a discrimination unauthorized under the laws of the State and the powers conferred upon the Board, would be to authorize a suit against the State of Alabama without its consent, proscribed by the Eleventh Amendment.[27]

Having concluded that, in the basic controversy, there was no liability of the Board, as a corporate entity, to respond in monetary damages either in an action *ex contractu* or *ex delicto*, it follows that this Court is without power to impose a compensatory fine in favor of petitioners in this proceeding in civil contempt.

Accordingly, an order will be entered herein, discharging the rule and dis-

missing the petition, following a separate order adopting the report of the special master.

---

24. Code of Alabama, 1940, Title 52, § 99.

25. Code of Alabama 1940, Title 52, § 71. Williams v. State, for Use and Benefit of Pickens County, 1935, 230 Ala. 395, 161 So. 507; City Board of Education of Athens v. Williams, 1935, 231 Ala. 137, 163 So. 802; State v. Tuscaloosa County, 1937, 233 Ala. 611, 172 So. 892.

26. Code of Alabama 1940, Title 52, § 199; First National Bank of Birmingham v. Walker County Board of Education, 1943, 243 Ala. 576, 11 So.2d 297.

27. See cases collected in Note 21, commencing with Christian.